**John T. GOJACK, Appellant,**

v.

**UNITED STATES of America,**
**Appellee.**

**No. 13464.**

United States Court of Appeals
District of Columbia Circuit.

Argued Nov. 2, 1959.

Decided June 18, 1960

Mr. Frank J. Donner, of the bar of the Court of Appeals of New York, New York City, pro hac vice, by special leave of court, with whom Mr. David Rein, Washington, D. C., was on the brief, for appellant.

Miss Doris Hope Spangenburg, Atty., Dept. of Justice, for appellee.

Messrs. Oliver Gasch, U. S. Atty., Lewis Carroll, John D. Lane and William Hitz, Asst. U. S. Attys., were on the brief, for appellee.

Mr. Harold D. Rhynedance, Jr., Asst. U. S. Atty., also entered an appearance for appellee.

Before WASHINGTON, BASTIAN and BURGER, Circuit Judges.

BASTIAN, Circuit Judge.

Appellant, an international vice president of United Electrical, Radio and Machine Workers of America and president of Local No. 9 of that organization, was

7. See note 4, supra.

8. See note 2, supra.

indicted under a nine-count indictment for contempt of Congress in violation of 2 U.S.C.A. § 192. He was tried by the court, a jury trial having been waived. Count One was dismissed when the United States Attorney was obliged to elect. On Counts Two and Five he was found not guilty. He was convicted on six counts and sentenced. Judgment was stayed pending this appeal.

The indictment charges that on February 28, 1955 and on March 1, 1955, in the District of Columbia, a Sub-committee of the Committee on Un-American Activities of the House of Representatives was conducting hearings pursuant to the Legislative Reorganization Act of 1946, Section 121(q), 60 Stat. 828, and to H.Res. 5, 84th Congress, that appellant appeared as a witness before that Subcommittee on the dates and at the place mentioned, that he was asked questions pertinent to the subject matter then under inquiry, and that appellant then and there unlawfully refused to answer those questions.[1] The Committee was considering the possible need for legislation to deal with alleged activities of Communists in the field of labor, including methods of infiltration of labor organizations and the dissemination of Communist propaganda. With respect to the foregoing, the Committee deemed it pertinent to its inquiry to ascertain appellant's awareness of the existence thereof, his knowledge of certain named persons as having been active in certain groups and, as well, his connection with and participation in an organization known as the American Peace Crusade, an organization believed by the Committee to be Communist-dominated. Appellant's refusal to respond to the questions noted led to the citation for contempt.

The case was extensively heard in the District Court by Judge Pine (now Chief Judge). Thereafter the trial judge found "that each of the questions involved was pertinent to the question under inquiry, which was authorized by the statute and resolution, and that they were pertinent to a valid legislative purpose." He held the fact that the inquiry resulted in exposure did not defeat its validity.

As to Counts Two and Five, the court held that appellant had given adequate reasons for not answering the questions there involved, including claimed protection under the First Amendment of the Constitution, and that the Committee did not disallow the objection and did not demand an answer, notwithstanding the objection. Therefore, under Quinn v. United States, 1955, 349 U.S. 155, 75 S. Ct. 668, 99 L.Ed. 964, the court found appellant not guilty on Counts Two and Five.

As to Counts Three, Four, Six, Seven, Eight and Nine, the court held there was no express claim that appellant declined to answer under the Fifth Amendment and that none could reasonably be inferred. He further found that the grounds given by appellant were insuffi-

1. The specific questions were:
    1. Were you ever a member of the Communist Party? [Dismissed by court on election of U. S. Attorney.]
    2. Were you then a member of the Communist Party in 1948, at any time during the year 1948? [Found not guilty.]
    3. Are you now a member of the Communist Party?
    4. You have left us under the impression at this point that by reading the newspapers you knew that Johnson was chairman of the Communist Party of Indiana and I am asking you if that is the only way you knew Johnson.
    5. Are you acquainted with Henry Aron, A-r-o-n? [Found not guilty.]
    6. Mr. Gojack, did Mr. Elmer Johnson or Mr. Aron ever appear and address a group of people when you were present?
    7. May I ask the witness, do you know whether or not Russell Nixon is a member of the Communist Party?
    8. Did you take active part in the peace pilgrimage to Washington which was organized by one of the "front" organizations known as the American Peace Crusade?
    9. What method was used to get you as an original sponsor? [That is, original sponsor of the American Peace Crusade.]

cient in law to justify his refusal to answer and that, upon being directed by the Committee to answer, he had refused to do so. The court held that insofar as these counts were concerned they did not come within the Quinn rule, and found that appellant intentionally and unlawfully refused to answer the questions propounded therein, that each and every element of the offense charged had been established beyond a reasonable doubt, and that, consequently, appellant was guilty on Counts Three, Four, Six, Seven, Eight and Nine. This appeal followed.[2]

2. This case and seven other contempt of Congress cases decided this day (all enumerated in the order set forth below) were originally set in this court for hearings *en banc* by order dated January 22, 1958, but, due to the then pending review in the Supreme Court of Barenblatt v. United States, 102 U.S.App.D.C. 217, 252 F.2d 129, certiorari granted 1958, 356 U.S. 929, 78 S.Ct. 771, 2 L. Ed.2d 760, which involved some of the same issues, we determined not to set them for argument until the Supreme Court had decided Barenblatt. In its opinion dated June 8, 1959 (360 U.S. 109, 79 S.Ct. 1081, 3 L.Ed.2d 1115), the Supreme Court affirmed this court in upholding Barenblatt's conviction. Thereafter, this court, by its order of September 25, 1959, rescinded its order for the *en banc* hearings and directed counsel in the eight cases to file memoranda with respect to the effect of the Supreme Court's opinion in Barenblatt and any other opinions of that Court in recent relevant cases. After receipt of the memoranda, this case and No. 13,737, Shelton v. United States, 108 U.S.App. D.C. ——, 280 F.2d 701, were heard by a panel of this court chosen by lot. Thereafter, the entire court entered the following order dated January 29, 1960: "It appearing that [No. 13,464, No. 13,529, No. 13,694, No. 13,737, No. 14,- 057, No. 13,656, No. 13,871 and No. 13,- 925] involve, principally, questions the same as, or similar to, the questions involved in Watkins v. United States, 354 U.S. 178 [77 S.Ct. 1173, 1 L.Ed.2d 1273] (1957), and in Barenblatt v. United States, and that this court, by order dated May 7, 1958, directed that the hearing of these cases be deferred until after the decision of the Supreme Court in the Barenblatt case; and it appearing that the opinion and decision of the Supreme Court in that case was rendered June 8, 1959, 360 U.S. 109, [79 S.Ct. 1081,

There is no serious factual dispute between the parties but two legal points are more seriously pressed than others.

## I.

■ Appellant here relies in large part on the question "whether or not the committee's purpose was non-legislative in character, in the sense that the expressed aim of the hearing was to do injury to appellant and the union which he represented at that time."

We think the finding of Judge Pine that the purpose of the Committee was

3 L.Ed.2d 1115], and the mandate therein having been received in this court on October 22, 1959; and it further appearing that this court, on September 24, 1959, determined that in the interest of the orderly administration of justice these cases be heard by one division of the court, and the full court having thereupon on that date drawn by lot a division for that purpose, which division was composed of Circuit Judges Washington, Bastian and Burger, it is this day

"Ordered by the court that the remaining six of the above-entitled cases be set for argument before the division of the court thus constituted, as above named, the dates of the arguments to be set by that division; and it is

"Further Ordered by the court that the opinion in each of the above-entitled eight cases contain in a footnote thereto a reference to this order."

These eight cases have this day been decided as follows:

No. 13464—Gojack v. United States —affirmed.

No. 13529—Russell v. United States, 108 U.S.App.D.C. ——, 280 F.2d 688 —affirmed.

No. 13656—Watson v. United States, 108 U.S.App.D.C. ——, 280 F.2d 689 —reversed.

No. 13694—Deutch v. United States, 108 U.S.App.D.C. ——, 280 F.2d 691 —affirmed.

No. 13734—Knowles v. United States, 108 U.S.App.D.C. ——, 280 F.2d 696 —reversed.

No. 13737—Shelton v. United States, 108 U.S.App.D.C. ——, 280 F.2d 701 —affirmed.

No. 13871—Liveright v. United States, 108 U.S.App.D.C. ——, 280 F.2d 708 —affirmed.

No. 13925—Price v. United States, 108 U.S.App.D.C. ——, 280 F.2d 715 — affirmed.

legislative is amply supported. The record clearly demonstrates that the Committee hearing was one constituting a continued investigation which the Committee was conducting into Communist activities in the labor field, including infiltration into labor organizations and Communist propaganda.[3] Hearings in 1955 had been held not only as to the Fort Wayne, Indiana, area (where the hearing in question was originally scheduled) but, as well, in New York City, Newark, New Jersey, Milwaukee, Wisconsin, Los Angeles and San Diego, California, and Seattle, Washington. That the dominant purpose of the investigation was legislative is shown by both the 1954 and the 1955 Annual Reports of the Committee on Un-American Activities to the House of Representatives, both of which report on the hearings. These Annual Reports evidence the continued purpose of the Committee of keeping the Congress informed as to actual Communist conspiracy to infiltrate critical areas and activities of our national life as steps in the ultimate effort to destroy our free form of government, and contain the

3. Included in the 1955 Annual Report of the Committee on Un-American Activities to the House of Representatives was the following extract from its report as to the Fort Wayne, Indiana, Area:

"The committee's continued investigation into Communist-dominated unions last year produced documented proof that leaders of such unions have misappropriated workers' dues for Communist Party purposes.

"Proof was obtained in the course of preparations for committee hearings on the activities of District 9 of the United Electrical, Radio, and Machine Workers of America. This district has headquarters in Fort Wayne, Ind., and supervises the affairs of local unions in both Indiana and Michigan.

"The national organization of UE was expelled from the CIO in 1949 because of the union's flagrant subservience to the Communist Party line. The committee scheduled an investigation and hearing in 1955 to determine whether the district office which guides locals in two important Midwest States was continuing the discredited policies of the national UE and placing Communist Party objectives above union interests.

"Investigation preceding the hearings showed that District 9 of UE was in fact operating under the control of Communists and their apologists, with workers' interests only a secondary concern when party purposes conflicted. In the course of this investigation, the committee obtained the official minutes of various meetings of the executive board of UE District 9. These documents contained incontrovertible evidence that the leadership of District 9 had diverted workers' union dues to the support of the Communist Party.

"The minutes obtained by the committee covered meetings of the District 9 executive board held on December 16, 1950; February 2, 1952; March 28, 1952; September 10, 1952; and October 6, 1952. With the record of only five executive board meetings in its possession, the committee can document the appropriation of more than $2,000 to Communist causes. The committee finds this practice particularly reprehensible in view of the fact that this money came from dues paid by workers who sincerely believed they were strengthening legitimate labor objectives. Less than 5 percent of the workers represented by Communist union leadership are members of or sympathetic to the Communist Party. Therefore, 95 percent of the membership of such unions are loyal Americans unwillingly or unwittingly forced to help finance a subversive conspiracy whose ultimate aim would destroy the very concept of a free labor movement.

"Among the Communist organizations to which the district 9 executive board diverted workers' dues are the National Negro Labor Council, which has been cited as subversive by the Attorney General, and the Prisoners' Relief Committee, which solicited financial help for Communist Party leaders arrested under the Smith Act. District 9 also 'generously' gave away workers' money to such notorious individuals as Harry Bridges and Harold Christoffel. Harry Bridges had been seeking funds to fight deportation proceedings. Harold Christoffel was active with other Communists in the Allis-Chalmers strike, which attempted to sabotage war production during the Hitler-Stalin pact. He had sought funds to defend himself against a perjury conviction resulting from his appearance before the House Committee on Education and Labor. By no stretch of the imagination can these expenditures serve the interests of any worker or union."

Committee's recommendations for additional legislation, if required. A large collection of material and exhibits is maintained by the Committee in connection with its constituted duties in order to furnish reference service not only to the Committee's own members and staff in its investigations and hearings, but also to every member of Congress who submits a written request for information in that field. More than thirteen hundred such requests were received in 1955.

Under its duty to keep the Congress continually advised as to Communist activities, the Committee, on February 9, 1955, had announced hearings to be held at Fort Wayne, Indiana, at which, according to newspaper accounts, appellant would be a witness. At the time of the announcement neither the Chairman of the Committee, Mr. Francis E. Walter (who did not preside at the hearing at which Gojack testified), nor the Committee counsel, nor the members of the Subcommittee had any knowledge that an N.L.R.B. election was pending at the Magnavox plant in Fort Wayne and had been set for February 24, 1955. It was not until February 10, 1955, that that fact was first made known to any of these persons. On that date Mr. Walter, in Washington, D. C., received from appellant a telegram,[4] the contents of which need not be characterized.

4. "Fort Wayne, Ind., 1050 AM
[Stamped FEB 10 11 50 AM]
"Representative Francis Walters
"House Office Bldg Wash DC
"Representative Walters' announcement yesterday of an Un-American Activities Committee hearing in Fort Wayne just prior to a National Labor Relations Board election at the Magnavox plant on February 24th is a flagrant use of a congressional committee for union-busting.

"UE Local 910 has had contractual relations with the Magnavox Company for 17 years with a record of gains and accomplishments for the workers second to none in the electronic industry. The Magnavox Company, aided by two raiding unions, is seeking to oust UE so that seniority rights, higher wages, and other contractual gains under UE can be abolished. With former Un-American Chairman Thomas serving a prison sentence for bribery, we have every right to ask whether the Magnavox Company is paying for this congressional assistance in union-busting. On Monday of this week, three days before Representative Walters announcement, the Magnavox industrial relations director, one George McClaren, announced to employees that the undersigned would be subpoenaed by Walters. In view of Matusow's confessions, we also have the right to know which type Matusow's witness representative Walters and the Magnavox Company would use.

"Last year, Un-American Activities Committee Member Clardy was defeated by the people of Michigan because of his use of this committee against the United Automobile Workers and in behalf of the auto corporations. Only last Tuesday, Representative Walters' own constituents repudiated his use of the Un-American Activities Committee in a witch-hunt campaign in behalf of the Ingersoll-Rand Company of Phillipsburg, New Jersey. The workers in that shop on Tuesday voted for UE by a vote of 1,451 against 508 for the IAM-AFL and 204 for the USA-CIO, in spite of Walters' interference in that shop and his lying claim that a 1950 strike there was 'communist-inspired.' Since Congressman Dies, this committee has been used to aid employers in attacks upon CIO, AFL and independent unions. As the late Cardinal Mundelein described it 'If it is really a committee to investigate "Un-American activities" it really should begin with itself.' More recently, the Detroit Free Press, a pro-management paper itself, declared editorially 'The most Un-American activity in the U.S. is the conduct of the congressional committee on un-American activities. It is so viciously flagrant a violation of every element of common decency associated with human liberty that it is a foul mockery on all that Jefferson and Lincoln made articulate in their dreams of a cleaner, finer order on earth. The hypocritically named committee on un-American activities should be abolished at the earliest possible moment by the U.S. Congress and so deeply buried that no other group of publicity-mad zealots could ever be allowed to tarnish with their stench the greatest institution of our democracy, our halls of legislation.'

"Should the House of Representatives permit Walters to so brazenly and openly aid the Magnavox Company in union-bust-

Thereafter, on February 14, 1955, one George Goldstein, a Washington representative of the union, sought an interview and asked for a continuance of the hearing until after the election scheduled for February 24. Mr. Walter requested that Mr. Goldstein's application for a continuance be made under oath, which Mr. Goldstein refused to do. Appellant urges that the colloquy which developed in this interview is evidence that the Committee was not engaged in furthering a legislative purpose but bent upon attempting exposure. The material parts of that interview relied on are set forth in the margin.[5]

Appellant also relies on the testimony of a newspaper reporter who authored a story in a newspaper to the effect that at the meeting of February 14, 1955, the "House Un-American Activities Committee members frankly stated that they were out to break the alleged Communist-led Independent United Electrical Workers Union." This reporter, however, admitted the accuracy of the stenographically reported conference between Mr. Walter and Mr. Goldstein on February 14 (footnote 5), and testified that he "thought" something more was said by Mr. Walter or another representative of the Committee. From the stenographic record of the conference of Mr. Walter and Mr. Moulder, Chairman of the sub-committee, and Mr. Goldstein, it can be gleaned that Mr. Walter showed some displeasure which, under the circumstances, and having in mind the abusive and insulting telegram (see footnote 4), can be understood and as readily be excused. Congressmen are more fortunate than judges in at least this respect, that when attacked unjustly, they are at liberty to defend themselves and to express themselves forcefully and vigorously.

At first the continuance of the scheduled hearing was denied. Notwithstanding the telegram and the other events we have noted, later a continuance was granted, the hearing was set for February 28, 1955, in Washington, D. C., and a new subpoena was issued and served. On that date Mr. Gojack appeared with his attorney, Mr. Donner, who also represented two other witnesses testifying.[6] At the opening of the session on February 28, Representative Moulder of Missouri, a member of the Sub-committee,

---

ing, the house itself will prove the Detroit Free Press absolutely right in the above-quoted editorial.

"We respectfully request your investigation of Representative Walters' latest action and his obvious tie-up with the Magnavox Company.

> "John T Gojack UE
> District Nine President
> 41835 South Calhoun St
> Fort Wayne Indiana"

5. "Mr. Goldstein. Let me say this. This is why I wanted to see you. I wanted to find out whether you and the committee were aware of the fact that this election was scheduled for the 24th.

"Chairman Walter. Not until we received an insulting telegram. After I received that telegram, then I became aware of the fact that there was an election being held. We had previously absolutely no knowledge of it, and the only reason we decided on this hearing there was because these people are there. If they are well enough to be in Fort Wayne, Indiana, working, they are well enough to testify. That is our attitude.

"Mr. Goldstein. Let me just say this. As far as I am concerned, this visit of mine was simply for the purpose of asking the question that I mentioned a moment ago, whether or not you were aware of that election, and if not, to tell you about it, and to say this: that it looked to us and it would look to a lot of people as though the coincidence of the two was more than a coincidence. *Now, I am saying that without accusing you.*

"Chairman Walter. I do not care if you accuse me or not. I do not care what you have to say about me. But this telegram said very definitely that this was a case of union-busting. Now, there is no one on this committee interested in busting unions. All of us have very established records, but all of us are interested in seeing your union go out of business, because we do not believe it is good for the United States." (Emphasis supplied.)

6. These witnesses preceded appellant in testifying on the same day, and it is clear that appellant was present during their testimony as he had been subpoenaed and was sworn immediately after they testified.

made the following announcement as to the purpose of the meeting:

"This subcommittee was appointed pursuant to the rules of the House as ordered by Francis E. Walter, chairman of the full committee, and it is composed of three members, the Hon. Clyde Doyle, of California, on my right, the Hon. Gordon H. Scherer, of Ohio, and myself as chairman of the subcommittee. Mr. Scherer, of Ohio, is absent and will be present within the next few minutes.

"There will be considered at this hearing testimony relating to Communist Party activities within the field of labor, the methods used by the Communist Party to infiltrate labor organizations, and the dissemination of Communist Party propaganda.

"We had expected to hear at this time the testimony of David Mates, an international representative of the United Electrical, Radio and Machine Workers of America. His appearance before this committee was continued twice at his own request. At this time the inability of the United States marshal to effect service of process strongly indicates an effort on the part of Mr. Mates to evade service. This matter will be investigated and, if the facts warrant, the House of Representatives will be requested to cause the issuance of a warrant for his arrest and production before this committee as a witness.

"In the course of the investigation conducted by this committee at Dayton in September 1954, information was obtained indicating that one or more of the witnesses to be heard today should have first-hand knowledge of Communist Party activities in the area of Dayton and elsewhere."

Attorney Donner, representing the three witnesses, at the time of the calling of the first witness, one Julia Jacobs, presented a motion, entitled "Statement of Objections to Hearing and Motion to Vacate Subpoenas," which is set forth in the margin.[7] The motion was not for-

7. "John Thomas Gojack, Julia Jacobs, and Lawrence Cover having been subpenaed by the House Committee on Un-American Activities for appearance at a hearing on February 28, 1955, respectfully move to vacate the said subpenas and to set aside the hearing on the following grounds:

"1. The Committee is not engaged in a legislative investigation for a bona fide legislative purpose. This Committee is limited under Article I, Section 1 of the United States Constitution to the exercise of legislative powers. The Chairman of the Committee has previously announced as is shown by newspaper clippings attached hereto that the purpose of the hearing is to force the United Electrical, Radio and Machine Workers of America (UE) 'out of business' and that with respect to the movants Gojack, and Jacobs 'to bring out the facts that they are card carrying Communists. The rest is up to the community'.

"This purpose is not legislative in character and hence is outside the Committee's powers.

"2. If the Committee seeks to inquire into activities of a criminal nature, no specific charges have been furnished the movants and no evidence has been offered that they have violated any law.

"In any event, the power to inquire into crime is one which is confided exclusively to courts and grand jurys under Article I Section 3 of the Constitution.

"3. The purpose of breaking a union, is not one which is authorized by the Committee's basic resolution, Public Law 601.

"4. Even if such a purpose were authorized by the Committee's basic resolution, the resolution as so construed and applied would constitute a violation of the free speech and assembly guarantees of the First Amendment to the Constitution.

"5. The Committee's basic resolution is in any event unconstitutional because no person can determine from it the boundaries of the Committee's power.

"6. The Committee intends, as its chairman has announced, to exact compulsory disclosure of movants' political beliefs and affiliations. The First Amendment forbids this particularly where as here there is no overriding legislative justification for such inquiry."

mally acted on until the following day, when it was formally denied. That it was in fact denied is clear from the fact that the witnesses represented by Mr. Donner were called, sworn and queried. It is to be noted that Mr. Donner was present throughout the hearing and was given the privilege of conferring with his clients at any time, and did from time to time confer with them.

Further as evidence that the object of the Committee was not "exposure" is the conduct of the members of the Subcommittee during the course of the hearing. For instance, when Gojack objected to the several questions relating to his membership in the Communist Party on the ground that these questions were put to him "to judge me guilty without benefit of trial," Mr. Doyle, member of Congress from California and a member of the Subcommittee, used this language:

"We are not adjudging anybody guilty. No, Mr. Gojack. Of course, if you think it is a matter of criminal intent and participation in a conspiracy to be a member of the Communist Party, then I understand why you might conclude that you are being found guilty without a trial. But we are not here finding anybody guilty. We are here as a group of Congressmen trying to find out the extent to which Communists have infiltrated your union, if they have— the union of which you are the executive vice president. That is what we are here for, young man; not to find you guilty of anything, but to find out the extent to which you know of Communist domination or control in your union, if there is such domination and control or infiltration."

With regard to the discussion of Gojack's connection with the American Peace Crusade, the following excerpt from the hearing is of interest:

"Mr. Tavenner [counsel for the Committee]: I want to make it clear, Mr. Gojack, that I am not interested in what your beliefs or opinions were about those matters.

What I am interested in is the extent to which the Communist Party was engaged in manipulating peace moves in this country in behalf of a foreign power. That is what I am interested in. My questioning of you is to determine what knowledge or information you had on the subject.

"Mr. Moulder. May I say, Mr. Tavenner, in connection with your statement, that the so-called peace moves on the part of the Soviet Union were being instigated over here as propaganda so as to prevent any opposition to their aggression and domination of the free world.

"Mr. Doyle. Mr. Chairman, may I add to those two fine statements that I am also interested in knowing what the witness knows about the extent to which the American Communist Party, in connection with these peace moves or otherwise, was using the leadership of American labor unions, especially any labor union that the witness might have been a member of at that time or had any connection with. The question is the extent to which the Communist Party had infiltrated American labor unions, if you know anything about it, the extent to which they were using it then and are using it now for their conspiratorial purposes."

Exposure no doubt resulted from the inquiry. But no one can fairly read the record without perceiving that the dominant purpose of the Committee was a legislative one, namely, to learn the extent of Communist infiltration or domination of labor unions. The court found:

"* * * that each of the questions involved was pertinent to the question under inquiry, which was authorized by the statute and resolution, and that they were pertinent to a valid legislative purpose, and that the committee was engaged in a valid legislative purpose. The fact that the inquiry resulted in exposure does not defeat the validity of the inquiry."

No specific findings in addition to those just recited were requested by appellant. Fed.R.Crim.P. 23(c), 18 U.S.C.A. Accordingly, we rest on the general finding of guilty, which necessarily comprised a finding against appellant on all essential issues.

## II.

The second question pressed by appellant is whether the rule of the Watkins case [8] applies and, if it does apply, whether it was followed in this case. It will be recalled that Watkins decided that a witness, having been summoned before a congressional committee, is entitled under appropriate circumstances to a statement of the purpose of the interrogation and an explanation of pertinency.

We think the Watkins rule was fully complied with. First, the subject matter of the hearing appeared "with undisputable clarity"; second, there was no "objection of the witness [or his counsel] on grounds of pertinency;" and, finally, the explanation of the Chairman not only was meaningful, but adequately and correctly described the topic under inquiry. It is not to be supposed that every question when put must be accompanied by "connected reasoning whereby the precise question[s] asked relate to it [i. e., the explanation]." The word "pertinency" or its equivalent nowhere appears in the objections. Appellant's attorney presented his objections to the hearing; no question of pertinency was raised.

On this subject of pertinency, it is scarcely possible to imagine a case more closely akin to Barenblatt than the present one. There, as here, and contrary to the situation in Watkins, the question under inquiry was disclosed in an illuminating manner; there, as here also, contrary to the situation in Watkins, the questions were not amorphous on their face, nor were they "clearly foreign to the alleged subject matter of the investigation—'Communism in labor.'" There, as here, the motion filed by appellant's counsel "at best * * * constituted but a contemplated objection to questions still unasked, and buried as they were in the context of petitioner's general challenge to the power of the Subcommittee they can hardly be considered adequate, within the meaning of what was said in Watkins, supra, 354 U.S. at 214–215, 77 S.Ct. at pages 1193–1194, to trigger what would have been the Subcommittee's reciprocal obligation had it been faced with a pertinency objection." Barenblatt, 360 U.S. at page 124, 79 S.Ct. at page 1091.

We think that, with the change of names, the following quotation from the Supreme Court's opinion in Barenblatt disposes of the contention of Gojack on the pertinency issue:

"We need not, however, rest decision on petitioner's failure to object on this score, for here 'pertinency' was made to appear 'with undisputable clarity.' [Watkins, 354 U.S. at 214, 77 S.Ct. at page 1193.] First of all, it goes without saying that the scope of the Committee's authority was for the House, not a witness, to determine, subject to the ultimate reviewing responsibility of this Court. What we deal with here is whether petitioner was sufficiently apprised of 'the topic under inquiry' thus authorized 'and the connective reasoning whereby the precise questions asked relate[d] to it.' [Id., 354 U.S. at 215, 77 S.Ct. at page 1193.] In light of his prepared memorandum of constitutional objections there can be no doubt that this petitioner was well aware of the Subcommittee's authority and purpose to question him as it did * * *. In addition the other sources of this information which we recognized in Watkins, supra, [354 U.S.] at 209–215 [77 S.Ct. at pages 1190–1194], leave no room for a 'pertinency' objection on this record. The subject matter of the inquiry had been identified at the commencement of the investigation as Communist infiltration into the field

8. Watkins v. United States, 1957, 354 U.S. 178, 77 S.Ct. 1173, 1 L.Ed.2d 1273.

of education. Just prior to petitioner's appearance before the Subcommittee, the scope of the day's hearings had been announced as 'in the main communism in education and the experiences and background in the party by Francis X. T. Crowley. It will deal with activities in Michigan, Boston, and in some small degree, New York.' Petitioner had heard the Subcommittee interrogate the witness Crowley along the same lines as he, petitioner, was evidently to be questioned, and had listened to Crowley's testimony identifying him as a former member of an alleged Communist student organization at the University of Michigan while they both were in attendance there. Further, petitioner had stood mute in the face of the Chairman's statement as to why he had been called as a witness by the Subcommittee. And, lastly, unlike Watkins, id., at 182–185 [77 S.Ct. at pages 1176–1178], petitioner refused to answer questions as to his own Communist Party affiliations, whose pertinency of course was clear beyond doubt.

"Petitioner's contentions on this aspect of the case cannot be sustained."

In sum, nowhere does it appear that appellant was without knowledge of the real purpose of the hearing or of the pertinency of the questions. The subject matter of the hearing was made to appear "with undisputable clarity" in the statement of Mr. Moulder, Chairman of the Subcommittee, and in the course of the questioning.

9. Assuming, *arguendo*, that conviction on some of the counts is open to question, we note that appellant's general sentence on all counts did not exceed the penalty that could have been imposed for any one count. Accordingly, "the judgment below must be upheld if the conviction upon any of the Counts is

### III.

The trial judge found, as above stated, that the grounds given by appellant were insufficient in law to justify his refusal to answer and that, upon being directed to answer, he had refused to do so; that the counts on which appellant was found guilty, namely, Counts Three, Four, Six, Seven, Eight and Nine, did not come within the Quinn rule and that he had intentionally and unlawfully refused to answer the questions comprising those counts. We agree.

Not only did appellant refuse to answer questions propounded but, as well, his attitude before the Subcommittee was abusive, insulting and contemptuous of the Committee and its members. The record of the hearing is replete with examples of that attitude but a few will suffice: He accused the Committee of using paid liars with which to "frame" witnesses; "I do not know what 'paid liars' and 'forgers' that you may have"; "I do not know what paid liar you have here to do a Matusow job on me"; "I haven't had the opportunity to vote myself a $10,000 raise"; "My answer to the question is when you have paid liars like Matusow, paid liars like Strunk, and paid liars like this lunatic Cecil Scott, around —." "Witch-hunting" by the Subcommittee was likewise charged by Gojack.

### IV:

■ We have examined the other grounds urged for reversal and find them likewise without merit.[9]

Affirmed.

sustainable." Barenblatt, supra, 360 U.S. at page 115, 79 S.Ct. at page 1087. In the present case, Counts 3, 4, and 7 are clearly sustainable. See Barenblatt, supra, passim. Cf. United States v. Hines, 2 Cir., 1958, 256 F.2d 561, which has no application here.