Robert SHELTON, Appellant,

v.

UNITED STATES of America,
Appellee.

No. 13737.

United States Court of Appeals
District of Columbia Circuit.

Argued Nov. 2, 1959.

Decided June 18, 1960.

Mr. Joseph L. Rauh, Jr., Washington, D. C., with whom Mr. John Silard, Washington, D. C., was on the brief, for appellant.

Mr. William Hitz, Asst. U. S. Atty., with whom Messrs. Oliver Gasch, U. S. Atty., Lewis Carroll and Harold D. Rhynedance, Jr., Asst. U. S. Atty., were on the brief, for appellee.

Mr. John D. Lane, Asst. U. S. Atty., also entered an appearance for appellee.

Before WASHINGTON, BASTIAN and BURGER, Circuit Judges.

BURGER, Circuit Judge.

This is an appeal from conviction and judgment after trial in the District Court for contempt of Congress growing out of refusal to answer questions asked by the Senate Internal Security Subcommittee.*

Shelton, a copy editor of a New York newspaper, was subpoenaed and appeared, first in executive session in New York City on December 7, 1955, and later in open sessions of the Senate Internal Security Subcommittee in Washington, about a month later. At both hearings he refused to answer questions on the subject of membership in the Communist Party and as to whether he had ever had conversations with a certain named person identified by the Committee as a Communist. He was convicted for contempt on two counts for refusal to answer questions.[1] At Shelton's request he was tried without a jury.

The Subcommittee was operating under a Senate Resolution adopted in 1950,[2] and continued thereafter,[3] which empowered it to make a complete and continuing study and investigation of (1) the administration, operation and enforcement of the Internal Security Act of 1950, 50 U.S.C.A. § 781 et seq.; (2) the administration, operation and enforcement of other laws relating to espionage, sabotage, and the protection of the internal security of the United States; and (3) the extent, nature and effect of subversive activities in the United States, including, but not limited to, espionage, sabotage, and infiltration by persons under the domination of the foreign government or organizations controlling the World Communist movement seeking the overthrow of the United States Government by force and violence.

Under this Resolution the Subcommittee had previously heard testimony from one Winston M. Burdett, a well known journalist, foreign correspondent and newscaster, who had been a member of the Communist Party from 1937 to the early 1940's. Burdett cooperated fully with the Subcommittee and gave information including names of persons with whom he had worked; he did not refer to appellant. Later the hearings involved in this case were called as part of a program "to pursue every lead which developed out of the Burdett testimony."[4]

---

* The circumstances under which the appeals in this case and seven other contempt of Congress cases came on for hearing in this court appear in footnote 2 of the opinion in Gojack v. United States, 108 U.S.App.D.C. —, 280 F.2d 678.

1. These questions were:
   (1)"Are you, sir, a member of the Communist Party, U.S.A.?"
   (2) "Did you ever have any conversation with Matilda Landsman?"

2. S.Res. 366, 81st Cong., 2d Sess. (1950).

3. S.Res. 7, 82d Cong., 1st Sess. (1951);
   S.Res. 198, 82d Cong., 1st Sess. (1951);

S.Res. 314, 82d Cong., 2d Sess. (1952);
S.Res. 46, 83d Cong., 1st Sess. (1953);
S.Res. 172, 83d Cong., 2d Sess. (1954);
S.Res. 49, 84th Cong., 1st Sess. (1955);
S.Res. 58, 84th Cong., 1st Sess. (1955);
S.Res. 209, 84th Cong., 2d Sess. (1956);
S.Res. 174, 84th Cong., 2d Sess. (1956).

4. Hearings before the Senate Subcommittee to Investigate the Administration of the Internal Security Act and other Internal Security Laws of the Committee on the Judiciary, 84th Cong., 2d Sess., pt. 17, at 1587 (1956).

Some time before appellant was first subpoenaed to appear the Subcommittee had received a letter stating that one "Shelton" who worked for the New York Times was informed about if not active in a "Communist Group" and knew of the Communist Party activities in newspapers. The author of the letter was not identified in the record but there was testimony that he was known to the Subcommittee as a source of reliable information on other occasions. Thereafter a subpoena was issued addressed to "Willard Shelton." In attempting to make service the process server learned that there was no "Willard" Shelton employed by the New York Times, but that a "Robert" Shelton was employed as a news copy editor. The Subcommittee then authorized amendment of the subpoena to add the words "or Robert Shelton," and it was served on Robert Shelton, appellant here.

The record indicates that at the outset of appellant's appearance before the executive session, the Subcommittee was uncertain whether appellant was indeed the person they thought to be in possession of information about Communist Party activities in newspapers generally or in his own newspaper. He was interrogated as to his background in order to clear up the question of identity, and in the course of that interrogation was asked and refused to answer substantially the questions set out in the margin, footnote 1. He was recalled 30 days later when the Subcommittee was holding public sessions.

At the opening of the public hearings in Washington on January 4, 1956, the Chairman pointed up the purpose of the inquiry, stating that the Subcommittee "could not be unmindful * * * that among the persons involved in this investigation have been many who were or are members of the press, and that the international Communist conspiracy has as one of its primary aims the influencing of public opinion, thus carrying on its psychological warfare against the United States and its institutions from inside by methods of penetration." [5] Early in the hearing Senator Hennings, a member of the Subcommittee, stated:

> "* * * that it be generally known and understood that this is not an attack upon any one newspaper, upon any group of newspapers as such, but an effort on the part of this committee to show such participation and such attempt as may be disclosed on the part of the Communist Party in the United States or elsewhere, indeed, to influence or to subvert the American press." [6]

The Subcommittee thus defined the general area of this series of hearings.

Immediately before appellant was called to the stand at the January 6 session, Senator Hennings also commented in part:

> "I think that no one will quarrel with nor take issue with the fact that this committee has the right to inquire into all efforts or, indeed, all consummations of efforts of the Communist Party to infiltrate newspapers or other media of communication. * * *
>
> \*  \*  \*  \*  \*
>
> "* * * And I do think in the interest of justice and in the interests of preserving the integrity and the high standing of this committee, we should be particularly cautious and aware of the possibility of unnecessarily calling one before us who may have nothing to add to the general subject matter of our inquiry and who may be seriously damaged in his own personal and professional life." [7]

The Chairman at the same time referred to a telegram from the Long Island Press asking the Subcommittee to do what it could to emphasize that it had led in efforts to expose Communist in-

---

5. Ibid.

6. Id. at 1588.

7. Id. at 1718–19.

filtration of the press and that it was supporting the Subcommittee's work. The Chairman commented: "The committee is not investigating the Long Island Press or any other newspaper. We are aware of the fact that the Long Island Press was alert to the danger of the Communist infiltration from a very early date and was aggressive and effective in combating this danger in its own organization." [8] Upon being called to take the stand at this point appellant challenged the Subcommittee's power to call him as a witness.

Shelton was then asked the questions set forth in the indictment and he refused to answer. He was duly cited for contempt for his refusal and upon being tried was found guilty as charged. Appellant did not rely on the Fifth Amendment to the Constitution as a reason for his refusal to answer questions.

Appellant urges numerous errors in the proceeding below. Briefly stated, they are:

(1) That Part 3 of Senate Resolution 366 is too vague and imprecise to authorize or permit the Subcommittee to compel answers.

(2) That appellant could fairly refuse to answer the questions since he was not told the "subject under inquiry," as required.

(3) That the pertinency of the questions to the subject matter was not explained.

(4) That the very nature of the questions violated appellant's First Amendment rights.

(5) That the indictment was faulty in failing to set out the "question under inquiry."

(6) That appellant need not answer any questions as the Subcommittee did not have "probable cause" to call him.

■ (1) The challenge to Senate Resolution 366, Part 3, as too vague to authorize the Subcommittee to compel answers to any questions must fall for several reasons. The Resolution as a whole and Part 3 in particular is more explicit than the House Resolution sustained by the Supreme Court in Barenblatt v. United States, 1959, 360 U.S. 109, 79 S.Ct. 1081, 3 L.Ed.2d 1115. The criticism of vagueness seemingly directed at the House Resolution in Watkins v. United States, 1957, 354 U.S. 178, 77 S.Ct. 1173, 1 L.Ed.2d 1273, does not in any event apply to Senate Resolution 366. In the recent Barenblatt case the Supreme Court confirmed the power of Congress to investigate activities of this character. Since its creation the Subcommittee has devoted itself to investigating subversive activities and Communist infiltration in many phases of American life, including infiltration in key industries, in television, radio and the press. Congressional awareness and approval of the work of the Committee can be found in numerous reports to the Congress by the parent Committee, and in repeated appropriations for its work.[9] In one report to the Senate the Committee specifically referred to the so-called "Burdett hearings" and other sessions in New York, relating to Communist efforts to infiltrate newspapers.[10] Whatever may have been argued at one time as to possible infirmities or vagueness in Resolution 366 under which the Committee was acting, the Barenblatt case and the legislative gloss attached to the Resolution has put this issue to rest.

■ (2) Appellant contends he was not informed of the subject or topic under inquiry and hence could not fairly decide whether he could be compelled to answer. The record discloses that at the opening of the hearings the investigation was expressly described as directed at the efforts and activities of the "international Communist conspiracy" to influence American public opinion through the press. Senator Hennings

8. Id. at 1718.

9. See note 3, supra.

10. Report of the Subcommitte on Internal Security to the Committee on the Judiciary for 1955, S.Rep. No. 1385, 84th Cong., 2d Sess., at 4 (1956).

also stated the hearings were for the purpose of showing "such participation and such attempt as may be disclosed on the part of the Communist Party * * * to influence or to subvert the American press." [11] In a colloquy with the Chairman only moments before appellant took the stand, Senator Hennings restated the same idea in these words "this committee has the right to inquire into all efforts, or indeed all consummations of efforts of the Communist Party to infiltrate newspapers or other media of communication." [12] Thus the subject matter was explained with the required clarity so that appellant could fairly evaluate the risks of refusing to answer. That the explanations given by the Chairman and Senator Hennings varied in terms did not in any way impair the clarity of the explanation. The broad subject matter of Communist Party infiltration and subversion, the narrower subject of efforts to influence American public opinion and the specific effort to use the press to implement these objectives were spelled out with utmost clarity not only in the remarks of the Subcommittee members but also in the context of the hearings. In the course of the hearings to pursue the "Burdett testimony" 18 persons connected with communications media were called.[13] The interrogation of these witnesses was directed at Communist activities in the press and communications field generally.

Moreover appellant's statement of objections to being questioned and his responses reveal his complete awareness of the subject matter of the inquiry. A great part of the statement [14] is con-

11. See note 6, supra.

12. See note 7, supra.

13. Six news reporters, one newspaper indexer, one motion picture exhibitor, an ex-bookseller, one newspaper proofreader, one magazine editor, two linotype operators, one copy editor, two news copyreaders, one ex-journalism professor, one newspaper education editor.

14. "The question also threatens freedom of the press as guaranteed by the first amendment. I believe no other governmental body in the free world would call a newspaperman and demand to know his political beliefs and associations. However unknowingly or unwittingly, gentlemen, in the quest for internal security, you are threatening long-standing and hard-won American liberties. The Supreme Court has held that— * * * the power to investigate, broad as it may be, is also subject to recognized limitations. It cannot be used to inquire into private affairs unrelated to a valid legislative purpose. Nor does it extend to an area in which Congress is forbidden to legislate * * *

A body is the sum of its organs, a machine the sum of its parts. An attack on the smallest component of a body or machine is an attack on the whole. An invasion of my individual rights is an invasion of the rights of the paper that employs me and an invasion of the rights of the newspaper profession as a whole. This subcommittee is nudging the end of my copy pencil, it is peeking over my shoulder as I work. This subcommittee is engendering the fear that soon it will be looking into newsrooms all over the country.

If, as a result of my being called here, I am put under mental pressure to change one word or one sentence in material that I edit, an abridgment of freedom of the press will have taken place. Demanding to know what is going on in the mind of a newspaperman without inhibiting a free press is impossible. Your question acts as a form of 'prior restraint' on publishing, telling newspaper executives who should or who should not be on their staffs.

A journalist's credo I wholeheartedly support is 'to give the news impartially, without fear or favor, regardless of any party, sect, or interest involved. * * *' But by being called before you to answer about my political beliefs and associations I am placed in fear of having my loyalty considered suspect if I do not, while freely exercising my sound conscience, answer this committee's questions. I am obliged to seek your favor to guard my personal integrity, and that of the paper for which I work. * * *

* * * * *

Let, me, in complete sincerity, cooperate with you by saying this: One of the greatest contributions that can be made toward the internal security of the United States would be to promote the maintenance of a press that is free and unfettered and unafraid; a press and newspapermen that will criticize what they

cerned with the dangerous consequences which the Committee's investigation would have on the freedom of the press. There is no difficulty in discerning his belief that a newspaperman should be immune from questions of the kind he refused to answer. While he was firm and clear in arguing that the questions were beyond the scope of the Committee's authority and that he was protected from inquiry by the First Amendment, he at no time asserted that the subject matter of the inquiry was too vague. Apart from the demonstrated clarity of the topic, we note that appellant sought no explanation of subject matter as he was entitled to do.

Significantly, here, as in the Barenblatt case, appellant's refusal to answer related to his own Communist Party affiliation, rather than the activities or membership of others. As in Barenblatt, the Subcommittee had a right to know if the witness was a member of the Communist Party, for that identification rendered more meaningful any testimony given by him concerning his own activities or concerning the presence or absence of Communist Party efforts to infiltrate the press. An inquiry into a possible conspiracy for infiltration or subversion of the press embraces the right to command the witness to say whether he is a member of the conspiracy, subject of course, to the right of the witness to take refuge in the Fifth Amendment. Barsky v. United States, 83 U.S.App. D.C. 127, 167 F.2d 241, certiorari denied 1948, 334 U.S. 843, 68 S.Ct. 1511, 92 L. Ed. 1767.

We find no substance in the contention that appellant was not aware of the topic and subject under inquiry.

■ (3) While appellant challenged the Subcommittee's authority, he did not, as we have noted, ask that the subject be stated. Nor did he object to the questions on the grounds of pertinency. In response to a challenge to the authority of the Subcommittee the Chairman advised appellant that the questions were directed at whether he was a part of the Communist conspiracy [15] then under investigation. The second count question involved whether he had any knowledge as to a Communist attempt to infiltrate Typographical Union No. 6, and whether he had ever discussed with Matilda Landsman the question of Communist activity in that union. Matilda Landsman was known to the Subcommittee as an employee of the New York Times who had, on directions of the Communist Party "downgraded" her job from news work to the press room in order to carry out "missionary" or "colonizing" work in the typographical employees. We hold that the pertinency of the questions was revealed by their context and that no additional explanation of pertinency was called for absent an objection to the question on that ground. No particular form or words are required to raise that objection but the interrogators must in some way be made aware that the witness objects to or is in doubt about the relationship of the question to the subject under inquiry. Appellant failed to do this, hence there was no duty on the Subcommittee to say more.[16]

Moreover the Watkins' standard on this score is qualified:

"*Unless* the subject matter has been made to appear with undisputable clarity, it is the duty of the

---

please and support what they please. It is a rightful role of the press to be a watchdog over government. It is not a rightful role of government to be a watchdog over the press. Let the reader at his breakfast table be the judge of whether a paper suits him or not, and by extension, whether the men who produce that paper suit him." S.Rep. No. 1934, 84th Cong., 2d Sess., 15, 16 (1956).

15. See Barsky v. United States, 83 U.S. App.D.C. 127, 167 F.2d 241, certiorari

denied 1948, 334 U.S. 843, 68 S.Ct. 1511, 92 L.Ed. 1767.

16. We note in passing that with respect to certain questions at both the executive and public sessions appellant frequently made objections explicitly on pertinency grounds. See S.Rep. No. 1934, supra note 14, at 4, 8, 13, 18. None of these questions formed the basis of his conviction.

investigative body, *upon objection* of the witness on grounds of pertinency, to state for the record the subject under inquiry at that time and the manner in which the propounded questions are pertinent thereto." (Emphasis added.) 354 U.S. at pages 214–215, 77 S.Ct. at page 1193.

This definition makes plain that if the subject matter has been made clear no explanation need be given, absent objection or request. In other words, *two* things must coincide to require an explanation as to pertinency: (1) that the subject matter be *unclear*, and (2) the witness must object.

■ (4) Essentially appellant argues that as a newspaperman he has a special immunity from questions as to possible membership in the Communist Party. He argues that this investigation was directed at his newspaper to discourage all "newspapers from hiring persons of unpopular, unorthodox or minority views and associations * * *." This, it is argued, results in "elimination of persons from the press who hold or once held unorthodox, unpopular or minority views or associations [and] is as effective a form of censorship as the deletion of the material they contribute to the press." Appellant's Brief, p. 32. This First Amendment argument is, in large part, that any inquiry such as this, directed to a member of the press is an impairment of the freedom of the press because it tends to intimidate all those engaged in that activity. But this inquiry was in no sense an investigation into the press as such, but into the question whether the constitutionally guaranteed freedom of the press was being used to undermine that very freedom and the foundation on which it rests. Barenblatt authorizes such inquiry. The investigatory power of Congress flows from the right of the government to preserve itself and its institutions. The important right of the press to be free and independent is not impaired by an inquiry into possible abuse of the right which is directed at destroying the very freedom the First Amendment assures. Indeed in the Barenblatt opinion in response to a similar argument the Court sharply pointed out that "investigatory power in this domain is not to be denied Congress solely because the field of education is involved." 360 U.S. at page 129, 79 S.Ct. at page 1094. Similarly, appellant's profession as a newspaperman does not preclude inquiry into his activities as a possible member or in behalf of the Communist Party. See Barsky v. United States, supra. Inquiry into generally protected areas must be subject to careful judicial scrutiny but the rights are not protected absolutely and they must yield to the superior right of Congress to know whether there is a dangerous abuse of those rights.

■ (5) Appellant urges that his conviction must be reversed because the indictment did not specifically recite the "question under inquiry." No authority has been cited which suggests that Rule 7(c), Fed.R.Crim.P., 18 U.S.C.A., requires an indictment under the statute to recite details of the authority and scope of inquiry.[17]

■ (6) Finally, appellant challenges the Subcommittee's subpoena power. The essence of this attack is that the subpoena under which appellant testified was invalid because the Committee had no reason to call appellant. This argument by its terms rests on the theory that in order to call appellant the Committee must show it had reason to believe he was or had been affiliated with or had information about Communists. Information about Communists is not the exclusive property of Communists. Many persons innocent of Communist

---

17. Sacher v. United States, 1958, 102 U.S. App.D.C. 264, 267, 252 F.2d 828, 831, held that an indictment under this statute need not "recite details of the authority and scope of the inquiry" and that holding stands undisturbed by the Supreme Court's action in Sacher v. United States, 1958, 356 U.S. 576, 78 S.Ct. 842, 2 L.Ed. 2d 987.

Party connections and bitterly hostile to Communism may possess important information about such activities. Hence a belief or showing that the Committee must have reason to believe the witness is or once was a Communist or in sympathy with them is unnecessary. The second phase goes to the argument that a legislative committee has no power to employ compulsory process without some reason to believe the witness has information about the subject under inquiry. There is relatively little authority on this general subject but United States v. Orman, 3 Cir., 1953, 207 F.2d 148, 154–155, suggests that congressional committees may not subpoena private citizens at random "indiscriminately in the mere hope of stumbling upon valuable information and to cite them for contempt if they refuse to answer * * *." The Supreme Court in Barenblatt noted the absence of evidence "that the Subcommittee was attempting to pillory witnesses," and absence of evidence that "petitioner's appearance as a witness follow[ed] from indiscriminate dragnet procedures, lacking in probable cause for belief that he possessed information which might be helpful to the Subcommittee." 360 U.S. at page 134, 79 S.Ct. at page 1097.

A careful review of this record satisfies us that the authority of the Subcommittee to conduct the hearings is plain, that there was full awareness on the part of the appellant that the subject matter was the possible infiltration of Communists into the radio, TV, and the press, including his own paper and that the questions were plainly pertinent to the topic. There is not the slightest indication in this record of an effort or desire or a tendency to pillory the appellant or other newspapermen or to call them indiscriminately without reason. After the important revelations of Winston M. Burdett, it was surely not a "dragnet" process to call appellant as a member of the working press to check on possible Communist Party activities among his fellow employees. The proper balance between individual rights and the broad public interests at stake here must be resolved in favor of the latter.

Other errors assigned by appellant have been carefully considered but we find no error which warrants reversal.

Affirmed.