**Herman LIVERIGHT, Appellant,**

v.

**UNITED STATES of America, Appellee.**

**No. 13871.**

United States Court of Appeals District of Columbia Circuit.

Argued Feb. 15, 1960.

Decided June 18, 1960.

Mr. Harry I. Rand, Washington, D. C., for appellant.

Mr. William Hitz, Asst. U. S. Atty., with whom Messrs. Oliver Gasch, U. S. Atty., Carl W. Belcher, Lewis Carroll, and Harold D. Rhynedance, Jr., Asst. U. S. Attys., were on the brief for appellee.

Mr. John D. Lane, Asst. U. S. Atty., also entered an appearance for appellee.

Before WASHINGTON, BASTIAN and BURGER, Circuit Judges.

### BURGER, Circuit Judge.

Appellant was convicted after jury trial on 14 counts of a 15 count indictment for refusing to answer pertinent questions before the Internal Security Subcommittee of the Committee on the Judiciary of the United States Senate.[*] The questions were asked during the course of an executive session and later at a public hearing before the Subcommittee.[1] Appellant was sentenced to three months imprisonment and a fine of $500. Conviction on any one of these counts would sustain such a sentence.

The hearings at which appellant appeared were part of a Senate investigation which had been in progress for 5 years or more under the authority of Senate Resolution 366, 81st Congress, 2d Sess. (1950),[2] concerning the opera-

---

[*] The circumstances under which the appeals in this case and seven other contempt of Congress cases came on for hearing in this court appear in footnote 2 of the opinion in Gojack v. United States, 108 U.S.App.D.C. —, 280 F.2d 678.

1. Indictment questions were as follows:

Count 1: "Are you now an active Communist?"

Count 2: "Have you been membership director of the Thomson-Hill branch of the Communist Party in 1943?"

Count 3: "Are you now a Communist?"

Count 4: "Have you ever been a member of the Communist Party?"

Count 5: "Were you sent on a mission for the Communist Party into the South?"

Count 6: "Have you affiliated with a Communist cell in the city of New Orleans, composed of professional people?"

Count 7: "Were there Communist meetings in your home at 333 Ware Street, in New Orleans?"

Count 8: "State whether or not you were at one time membership director of the Thomson-Hill branch of the Communist Party?"

Count 9: "We have information, sir, and we desire to know how this conspiracy is financed, that you have given money to the Communist Party on various occasions. State whether that is true or untrue."

Count 10: "In 1952, did you and your wife rent a post-office box in White Plains, New York?"

Count 11: "Did you attempt to rent a post-office box in White Plains, N.Y., under the name of the Westchester County Committee for Ethel and Julius Rosenberg?"

Count 12: "Is it not a fact that you sent those children away from home, from your home, in order to have a meeting in your home of a Communist cell, and you did not want your children to see the people in the city of New Orleans who belonged to this cell?"

Count 13: "When did you join the Communist Party, Mr. Liveright?"

Count 14: "Did word come to you from the Communist leadership in New York after you affiliated, to stay clean in New Orleans?"

Count 15: "Mr. Liveright, is your wife a member of the Communist Party?"

The indictment was laid under 2 U.S.C.A. § 192.

2. Senate Resolution 366 reads in part:

"*Resolved*, That the Committee on the Judiciary, or any duly authorized subcommittee thereof, is authorized and directed to make a complete and continuing study and investigation of (1) the administration, operation, and enforcement of the Internal Security Act of 1950; (2) the administration, operation, and enforcement of other laws relating to espionage, sabotage, and the protection of the internal security of the United States; and (3) the extent, nature, and effects of subversive activities in the United States, its Territories and possessions, including, but not limited to,

tion and enforcement of the Internal Security Act of 1950, 50 U.S.C.A. § 781 et seq., of laws relating to espionage and sabotage and the extent, nature and effects of subversive activities and infiltration by foreign controlled persons into various areas of American life.

The volunteered testimony of Winston M. Burdett, a prominent foreign correspondent and radio and TV newscaster, who appeared before the Subcommittee in 1955, had disclosed to the Subcommittee a widespread effort of the Communist Party to place persons under its discipline in positions of key importance in newsgathering and news dissemination media, including radio, television and newspapers. Burdett, before renouncing Communism and the Communist Party had served, among other capacities, as a courier for the Communist apparatus. Burdett gave the Subcommittee names and details of Communist Party infiltration, activities and techniques. Burdett did not give information about appellant.

When appellant appeared before the Subcommittee, he was represented by counsel shown by the record to be familiar with such work before the Internal Security Subcommittee. Prior to the hearing, appellant's counsel had conferred with counsel for the Subcommittee. Appellant was first questioned briefly in executive session where he refused to answer questions as to Communist Party membership and activities. He submitted a lengthy statement of the alleged legal and constitutional basis for his refusal to answer questions.[3]

The public hearing was held the same day appellant refused to answer questions in executive session. Almost without exception the indictment count questions were followed by consultation by appellant with counsel and as to all of them the written statement of objections was expressly made the basis for refusal to answer.[4]

While appellant always relied on his formal statement of objections he occasionally paraphrased the objection in exchanges with the Chairman or counsel. Typical is the following:

"I respectfully object to the power and jurisdiction of this subcommittee to inquire into my political beliefs, into any other personal and private affairs, and into my associational activities.

"I am a private citizen engaged in work in the field of communication.

espionage, sabotage, and infiltration by persons who are or may be under the domination of the foreign government or organizations controlling the world Communist movement or any other movement seeking to overthrow the Government of the United States by force and violence."

3. The statement is similar in substance to one given the Subcommittee by another witness, William A. Price, who appeared in hearings represented by Philip Wittenberg, the lawyer who appeared with appellant. Among other things the objection stated: "The Congress of the United States has no constitutional right to legislate with regard to prior restraint on utterance; no ex post facto law can be passed determining innocence or criminality, and therefore any investigations into my speech or communications is beyond the power of this committee * * *." S.Rep. No. 1766, 84th Cong., 2d Sess., p. 20 (1956).

4. Appellant's reliance on his counsel is further indicated by the colloquy at the close of his appearance:

"Chairman Eastland. Is there anything else?

"Mr. Morris. Not of this witness, Senator.

"Chairman Eastland. That will be all.

"Mr. Liveright. Thank you, sir.

"Chairman Eastland. Mr. Wittenberg, in the event that we may have to have Mr. Liveright testify again, may we do so by calling you instead of subpenaing him?

"Mr. Wittenberg. Yes, if you will give me enough time and remember that he is down in New Orleans.

"Mr. Morris. Oh, we understand that. You will supply him rather than have us subpena him again?

"Mr. Wittenberg. Oh, surely." Id. at 17–18.

"The grounds of my objection are as follows:

"Any investigation into my political beliefs, any other personal and private affairs, and my associational activities, is an inquiry into personal and private affairs which is beyond the powers of this subcommittee. I rely not upon my own opinion but upon statements contained in the opinions of the Supreme Court of the United States.

"Among others, in United States against Rumely, 345 United States —." S.Rep. No. 1766, 84th Cong., 2d Sess. at p. 10 (1956).

Appellant challenges his conviction on multiple grounds:

1. The charter of the Subcommittee is not based on a legislative purpose which justifies impairment of First Amendment rights.

2. The subject matter of the hearings was not made known to appellant.

3. The pertinency of the questions to any disclosed legislative purpose was not revealed to appellant with the required clarity.

4. The Subcommittee could not invade appellant's First Amendment rights to secure information which it already had in its possession.

5. The Subcommittee had no basis to subpoena appellant and it was reversible error to refuse to permit production of Senate records which contained the information relied on in calling appellant as a witness and error to deny appellant's demand to cross examine as to the sources of the Senate's information.

6. The Subcommittee was not lawfully constituted and even if it was it could not lawfully meet while the Senate was in session without special consent of the Senate, under 2 U.S.C.A. § 190b(b).

7. The issue of pertinency of the questions should have been submitted to the jury.

Other assigned errors have been carefully considered but do not warrant discussion.

[1] (1) As to appellant's first contention we hold that the charter of the Subcommittee rests on a broad but specifically described legislative purpose, namely the operation of internal security laws which Congress considered in need of constant legislative surveillance due to constantly changing Communist Party techniques as well as infirmities in the statutes. Specifically such witnesses as Burdett had made Congress aware of the Communist Party strategy of placing its disciples in key positions in the fields of communications, news-gathering and reporting, education and other areas in which public opinion could be influenced. This subject was within the Subcommittee's power to investigate. The responsibility and power of the Congress to pursue such inquiries is not open to doubt. Any possible interference with First Amendment rights is outweighed by the vital national interests at stake in the subject of the inquiry. See Barenblatt v. United States, 1959, 360 U.S. 109, 79 S.Ct. 1081, 3 L.Ed.2d 1115; Shelton v. United States, —— U. S.App.D.C. ——, 280 F.2d 701.

■ (2) As to the second contention that the subject was not made known to appellant, the record shows appellant's counsel conferred with Subcommittee counsel and both appellant and his counsel exhibited awareness of the subject of inquiry. At the opening of the public hearing Subcommittee counsel made a statement [5] as to the subject and purpose

5. "Mr. Chairman, before commencing the interrogation of this particular witness this afternoon, I would like to restate again for the record the purpose of the particular series of hearings being held by the Internal Security Subcommittee. I read now from the opening statement of the chairman:

" 'We shall try to determine to what extent Soviet power operates through the Communist Party here and to what extent other organizations have been devised to effectuate its purposes. We shall study the structural revisions that the Communists have made in their network in order to avoid detection, and

of the hearing and from time to time counsel or the Chairman added additional information by way of explanations [6] of pertinency in an effort to persuade appellant to answer.

The questions in context, appellant's responses to them, his statement of "objections" and the record as a whole disclose plainly and beyond dispute the subject of the investigation to be Communist Party tactics, infiltration and penetration into geographical areas and into particular professional groups including communications media. Assuming, arguendo, that the subject covered by the Senate Resolution was, in this case, not sufficiently specific and concrete to inform appellant of the subject under inquiry, the opening statement to him carefully pointed out at least one narrow and specific area or subject of inquiry. That limited area was defined as "the structural revisions that the Communists have made in their network in order to avoid detection, and * * * to trace the movement of individual agents through these changing structures." [7] This was pinpointed by telling him what had been reported to the Subcommittee about his "mission South" and the questions [8] re-

endeavor to trace the movement of individual agents through these changing structures.

\* \* \* \* \*

" 'We shall endeavor to determine to what extent this Soviet activity here is calculated to contribute to Soviet expansion abroad and to what extent it is working to undermine the structure and the composition of our own Government here, as the facts bearing on these issues are gathered in the public record of this subcommittee which will enable it to make recommendations or determinations as to whether the Internal Security Act of 1950 and other existing law should be repealed, amended or revised, or new laws enacted.'

"This witness is being called here this afternoon, Senator, in the course of that particular set or series of hearings." S. Rep. No. 1766, 84th Cong., 2d Sess., pp. 6–7 (1956).

6. "Mr. Morris: Mr. Chairman, this committee has been informed that Mr. Liveright and his wife were active in the Communist Party of New York City, and that at the time and date they moved to the South, they were formerly asked by their Communist Party superiors to keep away from formal associations with the Communist Party at that time in their activities." Id. at 12.

\* \* \* \* \*

"Chairman Eastland: The question [Have you ever been a member of the Communist Party?], Mr. Liveright, is very pertinent. We are attempting to see what amendments are needed to the Internal Security Act. In addition, and as a part of that, *we are tracing the activities of the Communist Party in this United States.*

"Our information is, sir, *that you were sent South and placed there with your*

*wife on a mission for the Communist Party*, and were told by your superiors not to become involved with a Communist cell that was a professional group in the city of New Orleans, *but the word was used by your superiors to stay clean.*

"Now, is that true? Were you sent on a mission for the *Communist Party into 'the South?"* (Emphasis added.) Id. at 13.

\* \* \* \* \*

"Chairman Eastland: Mr. Liveright, the Communist movement, with which we have information that you are affiliated, sir, is a conspiracy against your country. . . . *We have information, sir, and we desire to know how this conspiracy is financed, that you have given money to the Communist Party on various occasions. State whether that is true or untrue."* (Emphasis added.) Id. at 15.

\* \* \* \* \*

"Chairman Eastland: It seems that if you had not participated in this conspiracy and if you had not helped finance it, that you would be very glad to answer that question, Mr. Liveright." Ibid.

\* \* \* \* \*

"Chairman Eastland: You have the opportunity now to help your country by just frankly answering the questions and telling us the truth, to enable us to— * * * draft legislation to protect the welfare and the safety of our country. And it appears that you would be most anxious, Mr. Liveright, to do that. Most Americans would." Ibid.

7. S.Rep. No. 1766, 84th Cong., 2d Sess., p. 6 (1956).

8. See Indictment Counts 3, 5, 6, 7, 9, 12, 14, footnote 1, supra.

lated directly to this subject. See footnote 6, supra.

■ (3) The pertinency of the specific questions to this plainly revealed subject of inquiry is obvious from the questions themselves and from appellant's formal objections and his comments. Additionally the Chairman and his counsel explicitly spelled out their pertinency in their effort to persuade appellant to cooperate. See footnote 6, supra.

■ (4) The fact that the Subcommittee may have had every item of information concerning which appellant was interrogated does not reduce its right or power to seek confirmation directly from him. Moreover, appellant was entitled to an opportunity to refute or explain the information and reports about him before those activities possibly became the subject of any public reports the Subcommittee might make. Nor is it a bar to interrogation at a public hearing that appellant was asked and refused to answer some or even all of the same questions in executive sessions. Cf. Young v. United States, 94 U.S.App. D.C. 54, 212 F.2d 236, certiorari denied 1954, 347 U.S. 1015, 74 S.Ct. 870, 98 L. Ed. 1137.

■ (5) The argument that appellant is entitled to see and cross examine concerning the information which led the Subcommittee to issue a subpoena for him is without any merit on this record. It is plain here, as in Barenblatt, that the Subcommittee did not call appellant as part of a "broadside" or "dragnet" process. From various confidential sources, which Committee counsel testified they had found reliable in the past,

there were strong indications [9] that appellant may have engaged in Communist Party activities of the particular kind which the counsel stated were under special scrutiny, i.e., "structural revisions * * * in their network in order to avoid detection." If the information received by the Subcommittee concerning appellant's activities was true, his actions were not of a character protected by the First Amendment.

■ (6) Whether a Senate Subcommittee meets for inquiry purposes while the Senate is in session without prior consent of the Senate is not a matter available to appellant as a defense to his actions. Any infirmity in the conduct of the hearings in this respect was cured by the Senate action in citing appellant for contempt.[10]

■ (7) The pertinency of the questions to the subject matter is not for the jury but for the court and as we have indicated, the court decided the issue correctly. Sinclair v. United States, 1929, 279 U.S. 263, 49 S.Ct. 268, 73 L.Ed. 692; Keeney v. United States, 1954, 94 U.S. App.D.C. 366, 218 F.2d 843. The suggestion that there was a design to multiply the offenses by pursuing a line of questioning which appellant showed he would not answer is without merit. The courts will not permit a contumacious witness to bootstrap himself into immunity by his own recalcitrance.

■ As we have pointed out, the sentence imposed by the District Court on appellant would be sustainable even though appellant had been convicted on any one count of the indictment.

Affirmed.

9. Indeed item 1—the signing of Communist Party nominating petitions—was presumably available on the public record and appellant does not challenge that he did so sign, giving some indication that the other reports on appellant might be true.

10. Moreover, Senate Resolution 366, the basic enabling Resolution, specifically authorizes the subcommittee "to sit and act at such places and times *during* the sessions, recesses, and adjourned periods of the Senate, * * * as it deems advisable."