**Robert SHELTON, Appellant,**

v.

**UNITED STATES of America,
Appellee.**

**No. 17904.**

United States Court of Appeals
District of Columbia Circuit.

Argued Sept. 23, 1963.

Decided Dec. 30, 1963.

---

See also D.C., 211 F.Supp. 869.

Mr. Joseph L. Rauh, Jr., Washington, D. C., with whom Messrs. John Silard and Daniel H. Pollitt, Washington, D. C., were on the brief, for appellant.

Mr. William Hitz, Asst. U. S. Atty., with whom Messrs. David C. Acheson, U. S. Atty., Frank Q. Nebeker, Asst. U. S. Atty., and Robert L. Keuch, Attorney, Dept. of Justice, were on the brief, for appellee.

Before WILBUR K. MILLER, WASHINGTON and WRIGHT, Circuit Judges.

WRIGHT, Circuit Judge.

Appellant, Robert Shelton, was convicted[1] of unlawful refusal to answer two questions[2] propounded to him by the Subcommittee to Investigate the Administration of the Internal Security Act and Other Internal Security Laws of the Senate Judiciary Committee. His prior conviction on the same charges was reversed for failure of the first indictment to allege the limited subject under inquiry at the time the questions were asked. Russell v. United States, 369 U.S. 749, 82 S.Ct. 1038, 8 L.Ed.2d 240 (1962). At the second trial new testimony raised legal issues not considered in our first Shelton decision, 108 U.S. App.D.C. 153, 280 F.2d 701 (1960), which we find require reversal.[3]

1. The criminal statute involved is 52 Stat. 942, 2 U.S.C. § 192.

2. The two questions, asked at the January 6, 1956, hearing, were: "Are you, sir, a member of the Communist Party U. S.A.?" and "Did you ever have any conversation with Matilda Landsman?"

3. In addition to the reason for reversal shown in the text of this opinion, we question the factual findings of the District Court with reference to subject under inquiry, a central element of the offense charged. See Russell v. United

States, supra, 369 U.S. at 764, 82 S.Ct. at 1047, 8 L.Ed.2d 240. In the first Shelton case, the Government succeeded in proving, beyond a reasonable doubt, as alleged in the first indictment and as stated in the bill of particulars, that the subject under inquiry was not more limited than the authorization to investigate "subversive activities in the United States" stated in Senate Resolution 366, 81st Cong., 2d Sess. The second indictment alleged. as to this element of the offense, and the trial court found proved beyond a reasonable doubt, that the subject under inquiry at the time was indeed more limit-

At the first trial Subcommittee counsel Sourwine testified that there had been received an anonymous letter suggesting that a "Shelton" of the New York Times could give the Subcommittee useful information concerning Communist infiltration of the press. It was for this reason, he said, that he included the name "Willard Shelton" [4] on a proposed list of witnesses to be subpoenaed which he submitted to the Subcommittee chairman for approval. At the second trial [5] Sourwine testified he did not inform the Subcommittee chairman or any other member of the Subcommittee about the letter [6] or communicate to them any other reason for selecting "Willard Shelton." [7] As a matter of fact, no effort was made, according to Subcommittee counsel, to explain the reason for subpoenaing any particular witness.[8] The Subcommittee chairman was merely ad-

ed, *i.e.*, limited to "Communist activities in news media." In view of the disposition made herein, we do not pursue this apparent inconsistency or the related questions of estoppel and prejudice resulting from the six-year delay between trials.

4. Appellant Robert Shelton was employed as a copy editor on the New York Times. Willard Shelton happens to be the name of another newspaperman whose employment is not disclosed by the record.

5. Though this court held in the first Shelton case, supra, 108 U.S.App.D.C. at 160, 280 F.2d at 708, that the Subcommittee had authority to call "appellant as a member of the working press," the testimony at the second trial is unequivocal that Shelton was not called on this theory. Shelton was called because of an anonymous letter mentioning a "Shelton." The Subcommittee counsel stated, "I think we could have called anyone on the editorial side of the New York Times and asked them whether they had any knowledge of it" (Communist infiltration), but then testified, "I didn't ask the committee to authorize the subpoenaing of anyone on the basis of that theory."

At another time he stated:
"A. * * * Now, I'm not trying to withhold the facts from you, and I will be perfectly willing to concede here that he probably would not have been called; that is, we would not have sought to secure the testimony of the Shelton who worked on the news side of the New York Times if we had not received information from this informant that there was such a Shelton and that he was connected with a Communist group on the Times and should be able to give us information. Now that is the state of the facts.
"Q. In other words, you called him because you claim he [another staff member] got this letter, isn't that right?
"A. I claim I called him because we got this letter; yes, sir. I will accept that."

6. The testimony of the Subcommittee counsel:
"Q. Did any member of the committee know of the existence of this letter?
"A. Not to my knowledge. * * *
"Q. * * *
"A. No, I am satisfied that no member of the committee did."
The testimony of the Subcommittee chairman:
"Q. Senator, when did you first hear about an alleged letter from a confidential informant by the pseudonym of Finbar to the Senate Internal Security Subcommittee?
"A. During this trial.
"Q. During this trial?
"A. Yes, sir."

7. When the process server discovered "there was no Willard Shelton on the New York Times," but that there was a "Robert Shelton," he called Subcommittee counsel and then added the words "or Robert Shelton" to the face of the subpoena. A new subpoena bearing his own name was subsequently served on Robert Shelton, but by whose authority or instructions the record does not show.

8. The testimony of the Subcommittee counsel:
"Q. Now, let me see here, Mr. Sourwine, if I can correctly state your testimony with regard to the conversation of the then chairman Eastland. You gave him a list of prospective witnesses to be subpoenaed for executive session on which was the name of Willard Shelton, one name of which was Willard Shelton, and you told Chairman Eastland that you had reason to believe that all of them would give information relevant to Communist activity. If I am wrong, please correct me now.
"A. I do not want to say your statement is wrong, because I think that I probably conveyed that impression to Senator Eastland. But one, I do not remember the exact words, and two, I would

vised in general terms why counsel wanted subpoenas to issue. The record indicates that the subpoenas were prepared under the direction of the Subcommittee counsel and submitted to the chairman for signature. It does not appear, however, that the chairman always signed the subpoenas himself, having on occasion delegated that function to his administrative assistant.

On the first trial, appellant repeatedly attempted, without success, to have Subcommittee counsel produce the anonymous letter which he claimed supported the subpoena for a "Shelton." Sourwine maintained it was still in existence, but the Government simply declined to produce it. At the second trial, when appellant made an attempt to obtain the letter, Sourwine testified that while appellant Robert Shelton's first conviction was pending on appeal he had the letter destroyed as obsolete, through inadvertence.

Shelton contends that his First Amendment rights as an individual and as a member of the press were violated by the Subcommittee's effort to have him answer questions. At the time he refused to answer questions, asserting his First Amendment freedom, he told the Subcommittee that it was "peeking over my shoulder" while he was writing for the Times and "nudging the end of my copy pencil." He asserts here that, in addition to attempting to influence what he wrote, the Subcommittee lacked probable cause under the First or Fourth Amendments[9] to subpoena him. He states he was the victim of the accidental subpoenaing of the wrong Shelton. He also maintains that the Subcommittee violated its own rules in subpoenaing him, a point not raised on the prior appeal.

The Government asserts that the Subcommittee's investigation was of Communism, not of the press; that Shelton was subpoenaed on the basis of an anonymous letter which satisfied any need for probable cause under the First or Fourth Amendments; and that the subpoena for Shelton was validly issued over the

not have limited it to Communist activity. What I was trying to convey to him was that in any event, in my judgment the committee had information which led me to believe that all of these people had information to which they could testify if they would, that would further our investigation.

"Q. And you did not—am I correct— give case by case reasons for each of them?

"A. I did not."

9. Appellant cites Gibson v. Florida Legislative Comm., 372 U.S. 539, 557, 83 S.Ct. 889, 899, 9 L.Ed.2d 929 (1963), which states:

"Of course, a legislative investigation —as any investigation—must proceed 'step by step,' Barenblatt v. United States, supra, 360 U.S., at 130 [79 S.Ct. 1081, 3 L.Ed.2d 1115], but step by step or in totality, an adequate foundation for inquiry must be laid before proceeding in such a manner as will substantially intrude upon and severely curtail or inhibit constitutionally protected activities or seriously interfere with similarly protected associational rights. No such foundation has been laid here. * * *"

The Fourth Circuit recently applied the *Gibson* rule to a Virginia legislative committee's investigation of three Negro lawyers, holding that the court "can and should protect the activities of the plaintiffs and their clients in maintaining the privacy of their First Amendment activities against irreparable injury *unless and until there is a reasonably demonstrated factual basis for assuming that they are guilty* of the offenses which the Committee is interested in investigating." (Emphasis added.) The court held that there was jurisdiction and a claim stated in the suit to enjoin the committee's demands for information, and remanded for hearing as to the existence of an "adequate foundation" for the committee's investigation. Jordan v. Hutcheson, 4 Cir., 323 F.2d 597, 606 (1963).

In asserting that the Fourth, as well as the First, Amendment governs congressional compulsory process, appellant also cites Watkins v. United States, 354 U.S. 178, 188, 77 S.Ct. 1173, 1 L.Ed.2d 1273 (1957), and Barenblatt v. United States, 360 U.S. 109, 134, 79 S.Ct. 1081, 3 L.Ed. 2d 1115 (1959). Cf. Wheeldin v. Wheeler, 373 U.S. 647, 649–650, 83 S.Ct. 1441, 10 L.Ed.2d 605 (1963). See McGrain v. Daugherty, 273 U.S. 135, 156–158, 47 S. Ct. 319, 71 L.Ed. 580 (1927).

signature of the chairman of the Subcommittee on the recommendation of Subcommittee counsel.

In this case we tread in the delicate area of First Amendment freedoms. As in Rumely v. United States, 90 U.S.App. D.C. 382, 197 F.2d 166 (1952), affirmed, 345 U.S. 41, 73 S.Ct. 543, 97 L.Ed. 770 (1953), this court is asked to resolve a conflict between the informing function of Congress and appellant's First Amendment freedom as an individual and as a member of the press. We are asked to weigh the interest of the Government to obtain information in an area which may affect national security and the competing interest of the individual to be free from compulsory participation in such an inquiry. In short, we are asked to balance Congress' need to know against the right of the individual and the press to be let alone.[10]

Unquestionably, "[t]he power of the Congress to conduct investigations is inherent in the legislative process. That power is broad." Watkins v. United States, supra Note 9, 354 U.S. at 187, 77 S.Ct. at 1179, 1 L.Ed.2d 1273. But "[t]he Bill of Rights is applicable to investigations as to all forms of governmental action. Witnesses cannot be compelled to give evidence against themselves. They cannot be subjected to unreasonable search and seizure. Nor can the First Amendment freedoms of speech, press, religion, or political belief and association be abridged." Id., 354 U.S. at 188, 77 S.Ct. at 1179, 1 L.Ed. 2d 1273. Thus in this case we are asked

to stake out the limits of the investigative power of Congress insofar as that power affects the First Amendment rights of Shelton as a member of the press. We shrink from this awesome task and adopt a narrower disposition of this case which will not require the resolution of the constitutional problem presented.

In so doing, we press into service our opinion in Rumely v. United States, supra. There, faced with the same problem, we found that by an interpretation of the resolution which created the House Committee before which Rumely, a publisher, refused to testify and produce documents, we could avoid the constitutional question. We found that the resolution did not authorize the type of inquiry addressed to Rumely, and his contempt conviction was set aside.

In affirming that disposition, the Supreme Court indicated that even a strained interpretation of the congressional resolution was preferable to deciding the case on a constitutional basis. The Court noted that "[t]o give such meaning is not barred by intellectual honesty. So to interpret is in the candid service of avoiding a serious constitutional doubt." United States v. Rumely, 345 U.S. 41, 47, 73 S.Ct. 543, 546, 97 L.Ed. 770 (1953). Fortunately, here straining is unnecessary, for the charter of the Subcommittee makes clear that the Shelton subpoena was invalidly issued.

The Senate Internal Security Subcommittee was created pursuant to Senate Resolution 366 of the Eighty-first Con-

10. "Abuses of the investigative process may imperceptibly lead to abridgment of protected freedoms. The mere summoning of a witness and compelling him to testify, against his will, about his beliefs, expressions or associations is a measure of governmental interference. And when those forced revelations concern matters that are unorthodox, unpopular, or even hateful to the general public, the reaction in the life of the witness may be disastrous. This effect is even more harsh when it is past beliefs, expressions or associations that are disclosed and judged by current standards rather than those contemporary with the matters exposed.

Nor does the witness alone suffer the consequences. Those who are identified by witnesses and thereby placed in the same glare of publicity are equally subject to public stigma, scorn and obloquy. Beyond that, there is the more subtle and immeasurable effect upon those who tend to adhere to the most orthodox and uncontroversial views and associations in order to avoid a similar fate at some future time. That this impact is partly the result of non-governmental activity by private persons cannot relieve the investigators of their responsibility for initiating the reaction." Watkins v. United States, supra Note 9, 354 U.S. at

gress, Second Session. Section 2 of that resolution outlines the power of the Subcommittee with respect to the attendance of witnesses at hearings: "The committee, or any duly authorized subcommittee thereof, is authorized * * * to require by subpenas or otherwise the attendance of such witnesses * * * as it deems advisable.[11] * * * Subpenas shall be issued by the chairman of the committee or the subcommittee, and may be served by any person designated by such chairman." Examination of this authorization discloses that the resolution divides the authority with respect to the attendance of witnesses into two parts. The first gives to the committee or subcommittee itself the discretionary function of calling such witnesses "as it deems advisable." Thus it places in the Subcommittee the power *and the responsibility*[12] of deciding who shall be called. It then places the mechanical or ministerial function of issuing the subpoenas in the chairman.

■ Here, admittedly,[13] the Subcommittee did not determine the witnesses to be called. But the Government points to Rule 2 of the Subcommittee's rules and argues that, since the Subcommittee itself has interpreted the resolution in its Rule 2, the court must accept that interpretation. Rule 2, however, merely refers to the ministerial duty of issuing subpoenas. It says: "Subpenas for attendance of witnesses * * * shall be issued by the subcommittee chairman or by any other member of the subcommittee designated by him." Thus Rule 2 would allow the chairman to delegate his ministerial responsibility under the resolution for issuing subpoenas to another member of the Subcommittee. Rule 2 makes no reference whatever to the discretionary function of calling witnesses "it deems advisable," which function Senate Resolution 366 imposes on the Subcommittee itself.[14] Since the Subcommittee did not authorize the issuance of the subpoena to Shelton, the subpoena was invalid. Compare Yellin v. United States, 374 U.S. 109, 83 S.Ct. 1828, 10 L.Ed.2d 778 (1963).

Actually, one cannot read this record without realizing that the whole function of determining who the witnesses would be was *de facto* delegated to the Subcommittee counsel. Not even the chairman, by his own admission and that of the Subcommittee counsel, made the decision

197–198, 77 S.Ct. at 1184, 1 L.Ed.2d 1273. See also Rumely v. United States, supra, 90 U.S.App.D.C. at 390, 197 F.2d at 174.

11. This language was apparently taken from the Legislative Reorganization Act, which in pertinent part reads:
   "Each standing committee of the Senate, including any subcommittee of any such committee, is authorized * * * to require by subpena or otherwise the attendance of such witnesses * * * as it deems advisable."
   60 Stat. 831–832, 2 U.S.C. § 190b(a).

12. Especially in legislative *investigations* touching on "beliefs, expressions or associations" we cannot lightly allow the disregard of "procedures which prevent the separation of power from responsibility." Watkins v. United States, supra Note 9, 354 U.S. at 197, 215, 77 S.Ct. at 1194, 1 L.Ed.2d 1273.

13. The Subcommittee chairman testified:
   "Q. Oh, you got the approval of the subcommittee for all these subpoenaes?

   "A. Oh, no, not for the subpoena, no sir * * *."
   And Subcommittee counsel testified:
   "Q. Was there a committee meeting approving this list of witnesses for January 6?
   "A. No, sir."
   And Senator Hennings stated at the Subcommittee hearing immediately prior to Shelton's testimony:
   " * * * [W]e have no list of prospective witnesses, nor has any offer of proof as to what their testimony is likely to be been given to this subcommittee * * *.
       *       *       *
   "Today, for example, we have no list of witnesses who are to appear. * * *"

14. The authority "to delegate the exercise of the subpoena power is not lightly to be inferred. It is a power capable of oppressive use * * *." Cudahy Packing Co. of Louisiana v. Holland, 315 U.S. 357, 363, 62 S.Ct. 651, 655, 86 L.Ed. 895 (1942).

to call Shelton, nor did he know why Shelton was called. Thus, assuming the language of Senate Resolution 366, "The committee [may] require by subpena or otherwise the attendance of such witnesses * * * as it deems advisable," can be read to mean "as the chairman deems advisable," still the subpoena to call Shelton was invalid because the decision to issue it was *de facto* made by Subcommittee counsel alone.

█ As its final argument[15] on this point, the Government says that, in any event, the Subcommittee, by its presence at the time Shelton refused to answer the questions, ratified his appearance as a witness. We do not agree. Shelton had a right under the Subcommittee charter to have the Subcommittee responsibly consider whether or not he should be sub-

poenaed before the subpoena issued. Shelton's rights were abridged when the subpoena was issued without Subcommittee authorization.[16] Cf. Christoffel v. United States, 338 U.S. 84, 69 S.Ct. 1447, 93 L.Ed. 1826 (1949).

Finally, since this case is in many respects similar to Yellin v. United States, supra,[17] we repeat here what the Supreme Court observed there: "The Committee prepared the groundwork for prosecution in Yellin's case meticulously. It is not too exacting to require that the Committee be equally meticulous in obeying its own [charter]." 374 U.S. at 124, 83 S.Ct. at 1837, 10 L.Ed.2d 778.

Reversed.

WILBUR K. MILLER, Circuit Judge, dissents.

---

15. The Government suggests that § 2 of Senate Resolution 366 relating to the subpoenaing of witnesses concerns only the internal management of the Subcommittee and not the protection of the rights of witnesses. We think that Yellin v. United States supra, 374 U.S. at 115–118, 83 S.Ct. at 1832–1834, 10 L.Ed.2d 778, provides the answer to this suggestion. It is perfectly clear that here, as in *Yellin*, the rule governing the committee is for the protection of witnesses. Senator Hennings' statement at the January 6, 1956, Subcommittee hearing restates the duty of the Subcommittee itself, rather than Subcommittee counsel, to determine which witnesses to call. The statement phrases the decision in terms of balancing the value of the witness' testimony against the injury that would be caused by requiring testimony. Indeed, Senator Hennings explicitly refers to the Subcommittee's duty in this regard as "a duty to protect witnesses." See Hearings Before the Subcommittee to Investigate the Administration of the Internal Security Act and Other Internal Security Laws of the Committee on the Judiciary, United States Senate, Pursuant to S.Res. 58, 84th Cong., 2d Sess., Part 17, at pp. 1718–1719 (1956).

16. We note that Shelton's appearance at the public hearings, which forms the basis for his contempt citation, was under the authority of the same subpoena summoning him to the prior executive session. We have discussed above the circumstances of the issuing of that subpoena. The record is clear that no decision of the Subcommittee to call Shelton was made at any time after that subpoena issued and prior to the public hearings. Senator Hennings so stated at the public hearing itself. See Note 13, *supra*.

17. In *Yellin*, which involved a rule on private and public sessions of the House Committee on Un-American Activities, the Court noted two improprieties, both analogous to the facts of this case: the "decision to question Yellin publicly, made before serving him with a subpoena, was made without following" the Committee rule, and a Committee "Staff Director, who lacked the authority to do so, acted in the Committee's stead" in making a decision on Yellin's testifying in public. Yellin v. United States, supra, 374 U.S. at 119, 83 S.Ct. at 1834, 10 L.Ed.2d 778. The factual similarity to this case is obvious.