Sosman, J.
The Commonwealth has moved for a ruling that, in producing documents to Congressman Thomas Bliley on April 6, 1998, defendants waived whatever privileges might otherwise protect those documents. Defendants contend that their production of documents to Congressman Bliley was compelled and therefore not a waiver of any privilege. F or the following reasons, the Commonwealth’s motion is ALLOWED.
Background
The Commonwealth has brought the present action seeking to recover from defendant cigarette manufacturers, trade associations and distributors the Medicaid costs allegedly attributable to cigarette smoking. Similar lawsuits have been filed against these same manufacturers and trade associations by other states around the country. In June 1997, the cigarette manufacturers and their trade associations agreed to the so-called “national settlement,” pursuant to which they sought to settle all such claims. The settlement was contingent, inter alia, on the passage of federal legislation that would grant defendants certain limitations and protections with respect to their liability in smoking and health lawsuits. All parties to the settlement committed to support the passage of such federal legislation.
Meanwhile, the lawsuits themselves continued, including the suit pending in the state of Minnesota. On September 10, 1997, a Special Master appointed to handle discovery issues in the Minnesota action issued a Report and Recommendation recommending that the defendants’ claims of privilege should not be" sustained with respect to certain categories of documents. One of the articulated bases for that recommendation was that the documents were not privileged on account of the “crime-fraud” exception.
By sometime in the fall of 1997, the House Committee on Commerce began considering legislation of the type called for by the national settlement. On November 13, 1997, the Chairman of the Commerce Committee, Congressman Tom Bliley of Virginia, wrote to Philip Morris Companies, Inc. (“Philip Morris”), RJR Nabisco, Inc. (“RJR”), Lorillard, Inc. (“Lorillard”) and Brown & Williamson Tobacco Corporation (“B&W”) asking that they produce the 864 documents identified in the report of the Special Master in Minnesota. The letter described that the Commerce Committee was considering legislation which, if enacted, “would provide the tobacco industry with limited immunity from lawsuits.” Chairman Bliley explained that the documents, which “possibly contain[ed] evidence of criminal or fraudulent activities by certain tobacco companies," were needed “[t]o assist the Committee in its legislative consideration of this settlement agreement and its civil liability provisions.” He requested that the documents be produced by December 4, and indicated that he would consider issuing a subpoena on December 5 if the documents were not produced.
*548 Representatives of the defendants thereafter engaged in discussions with Chairman Bliley and/or his staff, but no documents were produced by the December 4 date requested. On December 4, Chairman Bliley issued subpoenas to each of the defendants, commanding the production of the documents by noon the following day, December 5. Defendant Philip Morris produced the documents on December 5. Philip Morris’ cover letter accompanying that production included the following:
We are producing these documents to the Committee pursuant to this subpoena. In discussion with your office we have been informed that the Committee will overrule any assertion of privilege with respect to this group of documents because of the ruling in Minnesota that these documents are not privileged. Under these circumstances we have no choice but to comply with the subpoena.
Lorillard also sent Chairman Bliley a letter, asking that Philip Morris’ production of the documents be deemed Lorillard’s compliance with the subpoena. Lorillard’s letter also included verbatim the above-quoted portion of Philip Morris’ letter. Defendant RJRalso sent a letter dated December 5, 1997 stating that Philip Morris’ production satisfied RJR’s subpoena. RJR’s letter also recited that “the Committee has already determined that it will not recognize Reynolds’ claims of privilege,” that RJR therefore had “no choice but to comply with the subpoena,” and that it was not waiving any privilege claims concerning the documents. Finally, defendant B&W sent its letter claiming that the production by Philip Morris rendered the request “moot” and that it would therefore “not be necessary for Brown & Williamson to file a formal response asserting its claim of privilege.”
On December 18, 1997, the Commerce Committee released the documents to the press and the public via the Internet. On December 26, 1997, the Commonwealth requested this court to overrule defendants’ privilege claims with respect to the documents because they were “in the public domain.”
Defendants opposed the Commonwealth’s request, arguing that their compliance with a Congressional subpoena was production under compulsion, not a voluntary waiver. Because a witness served with a Congressional subpoena can not obtain a court ruling on privilege claims without first standing in contempt, Eastland v. United States Servicemen’s Fund, 421 U.S. 491 (1974), “the only legal steps necessary to protect a privilege while complying with a congressional subpoena are (1) to assert the privilege and (2) to obtain a ruling from the committee chair.” Defendant’s Memorandum in Opposition to the Commonwealth’s Position That Privileged Documents Should Be De-Privileged Because They Are In the Public Domain, p. 20. However, what defendants claimed was a “ruling from the committee chair” was their unspecified conversations with unidentified persons on Chairman Bliley’s “staff’ during which they allegedly “were advised by Chairman Bliley’s office that the Committee on Commerce, by its Chairman, had decided to overrule defendants’ claims of privilege.” Affidavit of Steven C. Parrish, 15.
On February 26, 1998, this court ruled that the conclusory, non-specific assertion of a conversation with an unidentified person in the Chairman’s “office” was not a “ruling from the chair,” and that defendants’ production of documents without obtaining a ruling from the chair meant that they had not pressed their privilege claims to the actual brink of contempt. Unless all avenues short of contempt are exhausted, production is not deemed to be “compelled” and is therefore a waiver.[1]
History proceeded to repeat itself. On February 10, 1998, the Special Master in Minnesota issued a further Report recommending that defendants be ordered to produce another 39,000 documents that had been withheld from production on grounds of alleged privilege. On February 19, 1995, Chairman Bliley again issued subpoenas to the cigarette manufacturer defendants, as well as to defendant The Council for Tobacco Research-U.S.A., Inc. (“CTR”) and defendant The Tobacco Institute, Inc. (‘Tobacco Institute”), calling for production of all documents identified in the Special Master’s February 10 Report and Recommendation.[2] The subpoena required production of the documents by March 12. Although the subpoena called for production of the documents themselves, the subpoena was accompanied by a letter from Chairman Bliley, in which he related that production “in electronic form on CD-ROM will be deemed to constitute compliance.” The letter went on to express appreciation for the companies’ “cooperation with the efforts of the Committee on Commerce to inform our Members and the American public on issues central to the proposed tobacco settlement.” There again followed discussions between defendants’ representatives and Chairman Bliley (and/or his staff), the contents of which have not been revealed by defendants.
On March 7, the trial judge in Minnesota affirmed the Special Master’s recommendation, ordered that the documents be produced within forty-eight hours, and denied defendants’ request for a stay pending appeal.[3] Defendants immediately appealed the order and obtained a stay from the Minnesota Court of Appeals.
On March 12, the original due date under the subpoenas, defendants’ counsel sent Chairman Bliley a letter advising him of the steps that were being taken to appeal the Minnesota order. The letter also outlined alleged procedural deficiencies in the way the Special Master and the trial judge had handled defendants’ privilege claims. In closing, the letter requested “that the Committee either extend any deadline for any response to its subpoenas or refrain from issuing any ruling or direction with respect to the companies’ *549 privilege claims here until the conclusion of the Minnesota appellate process, which we hope will be an expedited one.”
There was no written response to the March 12 letter. There were further discussions between defendants’ representatives and Chairman Bliley (and/or his staff), the contents of which also have not been revealed. Where nothing was done or said to enforce the subpoenas on or shortly after the March 12 deadline, the court infers that Chairman Bliley acquiesced and agreed to await the outcome of the appellate process in Minnesota.
On March 17, the Minnesota Court of Appeals denied defendants’ petitions. Defendants then sought further review before the Minnesota Supreme Court. On March 27, the Minnesota Supreme Court denied the petitions for further review. Defendants filed a petition for writ of certiorari and an application for stay before the United States Supreme Court. The application for stay was denied on April 6.
On the same day, April 6, as soon as the stay was denied, there followed a letter from Chairman Bliley to defendants’ counsel. Chairman Bliley’s letter acknowledged that defendants had asserted attorney-client and work product privileges for the documents and then advised:
The claim of privilege for the documents requested in the subpoenas will not be recognized. Further, unless the documents in question are produced immediately, I intend to proceed with a contempt resolution for enforcement of the subpoenas by the House of Representatives.
After consulting with the Committee’s Ranking Member, Mr. Dingell, we have agreed to conduct a confidential review of the documents produced pursuant to the February 19, 1998 subpoenas to determine their suitability for release.
I urge your clients to remedy their current non-compliance status by immediately producing the subpoenaed documents.
Later that same day, the defendants produced approximately 37,000 documents on CD-ROM with privilege logs, searchable indices, and a glossary of names (items not called for by the subpoenas, but clearly of great assistance to anyone seeking to review this massive production).[4] Each defendant submitted its own cover letter accompanying the production. Philip Morris submitted a three-page letter including the following history:
By letter dated March 12,1998, Philip Morris, along with each of the other defendants, asserted attorney-client and attorney work-product protection in response to this Committee’s February 19, 1998 Congressional subpoena. By letter dated April 6, 1998, the Committee, acting through its Chairman, rejected and overruled these claims of privilege and directed Philip Morris to produce the documents in question immediately. The Committee further made clear that failure to comply with its ruling would be treated by the Committee as a criminal contempt of the United States Congress and a that [sic] contempt solution [sic] would be pursued.
Under such circumstances, and for precisely the reasons that we were compelled to comply with the Minnesota court’s order rather than stand in contempt of it, Philip Morris now has no choice but to abide the Committee’s direction and make the documents available to your office for review.
Lorillard and the Tobacco Institute each submitted letters virtually identical to that of Philip Morris. RJR’s two-page letter included the following:
While your letter of April 6, 1998 states that the Committee will not recognize the claim of privilege for the documents requested, R.J. Reynolds does not waive any claims of privilege it may have concerning these documents and are [sic] producing them, not voluntarily, but solely under the threat of contempt of Congress for non-compliance with the subpoena.
B&Ws two-page letter recited a similar version: “Your letter of April 6, 1998 confirmed that the Committee will not recognize these privileges, directed us to produce the documents and informed us that, if we did not do so immediately, we would be held in contempt.” CTR’s three-page letter gave another variant of this theme:
CTR has asserted, and continues to assert, that these documents are protected from disclosure by one or more privileges. CTR is providing these documents to the Committee on Commerce, based on the Committee’s overruling of CTR’s assertions of privilege with respect to these documents, as set forth in your letter of today to Mr. Meyer Koplow. Your letter made it clear that if CTR failed to produce immediately the documents called for by the subpoena, you would proceed to enforce the subpoena by initiating contempt proceedings.
Shortly after the production was made to the Commerce Committee, the defendants produced the documents to opposing counsel in the Minnesota action.
At the time of this production, defendants still had pending a request to the Minnesota court that the documents turned over to the Attorney General not be further disclosed by him. At the time, they did not know whether that request would be granted, nor did they know which of the documents just produced would be admitted into evidence at trial and thereby become public. Several of the April 6 letters to Chairman Bliley pointed out that the documents had not yet been made public by way of the Minnesota proceedings and that defendants were attempting to prevent that public disclosure. All of the letters urged Chairman Bliley not to release the documents to the public and, in any event, to screen the documents one *550 by one before deciding whether to make them public. Representatives of some of the defendants met with Commerce Committee staff to further urge that the documents not be made public.
On April 22, 1998, the Commerce Committee made public all but approximately 400 of the documents that had been produced and posted them on the Internet.[5] The Committee ultimately decided to release those 400 documents as well, and the entirety of the documents produced pursuant to the February 19 subpoena are now publicly available and posted on the Internet.
Discussion
A parly asserting attorney-client privilege bears the burden of proving that the privilege is applicable. The privilege claimant must show not only that the privilege exists but must also show that the privilege has not been waived. In the Matter of the Reorganization of Electric Mutual Liability Insurance Co., 425 Mass. 419, 421-22 (1997). Thus, on the present motion, it is not up to the Commonwealth to prove that defendants waived the privilege. Rather, the burden of proof is on the defendants to prove that they have not waived the privilege.
A voluntary disclosure of privileged material waives the privilege, not only in the forum or setting in which the voluntary disclosure is made but for all purposes and in all settings. See United States v. Massachusetts Institute of Technology, 129 F.3d 681, 684-85 (1st Cir. 1997); Genentech, Inc. v. United States International Trade Commission, 122 F.3d 1409, 1416 (Fed. Cir. 1997). However, a compelled disclosure of an allegedly privileged item is not a waiver, and a compelled disclosure in one forum does not abrogate the privilege in any other forum. See United States v. de la Jara, 973 F.2d 746, 749 (9th Cir. 1992); Shields v. Sturm, Ruger & Co., 864 F.2d 379, 382 (5th Cir. 1989).
Defendants do not dispute that they produced the documents in question to the Commerce Committee, nor do they dispute that the documents themselves are now publicly available. They contend, however, that the production to Congress was compelled. The burden is on defendants to prove to this court that their compliance with that Committee subpoena was in fact compelled and not voluntary.
Production in response to a subpoena is not normally viewed as a compulsory disclosure. In order to preserve any privilege, the subpoenaed witness must take all steps reasonably available to contest that subpoena, and only if those steps are unsuccessful will testimony or document production in compliance with the subpoena be treated as a compulsory disclosure. Compliance with a subpoena without first exhausting the available avenues to challenge it is deemed a waiver of any privileges that might otherwise apply. See Westinghouse Electric Corp. v. Republic of the Phillippines, 951 F.2d 1414, 1427 n.14 (3d Cir. 1991); Velsicol Chemical Corp. v. Parsons, 561 F.2d 671, 675 (7th Cir. 1977).
In most circumstances, a person served with a subpoena has an opportunity to challenge that subpoena in court. Most of the jurisprudence about how far a party must go in challenging a subpoena in order to avoid a waiver arises in cases where the privilege claimant has sought relief from a court, either by way of a motion to quash the subpoena, or motion for a protective order, or by opposing a motion to compel. In that customary setting, a party that has pursued such remedies unsuccessfully and has received a court order requiring compliance with the subpoena is treated as having exhausted all reasonable steps, and no privileges are waived if the party then proceeds to comply with the subpoena. The party is not required to defy the court order and stand in contempt of court in order to preserve the claim of privilege. A court order is sufficient “compulsion.” See Transamerica Computer Corp. v. International Business Machines Corp., 573 F.2d 646, 651 (9th Cir. 1978). However, all steps short of contempt must be exhausted before the disclosure will be viewed as compelled.
Applying this jurisprudence to a party’s response to a Congressional subpoena is not a straightforward matter. A person seeking to challenge a Congressional subpoena does not have any ability to obtain a court order quashing or modifying that subpoena, as the Speech or Debate Clause of the United States Constitution prevents such judicial interference with legislative activities. Eastland v. United States Servicemen’s Fund, 421 U.S. 491 (1975). Court review of a Congressional subpoena can only occur as part of a contempt proceeding. Given that a party is not required to go into contempt in order to preserve a privilege, a person served with a Congressional subpoena should not be required to get court review by way of contempt in order to preserve the privilege.
In determining what steps a privilege claimant must take to oppose a Congressional subpoena before compliance will be deemed to waive that privilege, one must first identify the point at which the witness would be stepping over the boundary into an irrevocable contempt of Congress and then identify all the avenues of challenge that are available to that witness prior to that point. That analysis is complicated by the fact that there are no set rules or procedures for handling objections to Congressional subpoenas. Congress’ handling of objections is a matter of practice, lore and politics that does not yield any set of consistent rules, steps or procedures.
The parties agree that a witness is in contempt if, after making a privilege objection in response to a Congressional subpoena and obtaining a “ruling from the Chair" overruling that objection, the witness refuses to comply with the subpoena. They differ as to whether Chairman Bliley’s April 6 letter qualifies as a “ruling from the Chair.” Defendants argue that any *551 indication from the Chair of a committee, however formally or informally transmitted, that the Chair does not or will not recognize the claim of privilege is a “ruling from the Chair.” They further argue that, since witnesses have no “right” to appear at any hearing before the committee to argue their privilege claims, there is no step that they can take to challenge the Chair’s “ruling,” and that any refusal to answer questions or produce documents after that “ruling” is contempt. The Commonwealth argues that the Chair does not have the unilateral authority to accept or reject assertions of privilege, that he can only act either during a committee meeting (or at least with the concurrence of a majority of the committee) and that an anticipatory statement or prediction as to the Chair’s view is not a “ruling” on the witness’ objection. In the Commonwealth’s view, there is no “ruling” finally rejecting an assertion of privilege unless and until the Chair renders a ruling during a committee meeting and the committee itself ratifies that ruling.
Congressional rules on the subject do not resolve the issue. Under both the House rules and the rules of the Commerce Committee, a subpoena may only issue with the vote of a majority of the members of the Committee. Rules of the House of Representatives for the 105th Congress, Rule XI 2.(m)(2)(A); Rules for the Committee on Commerce, U.S. House of Representatives, 105th Congress, Rule 21. This requirement is designed to prevent abuse of the subpoena power by an individual committee member. See Exxon Corp. v. Federal Trade Commission, 589 F.2d 582, 592-93 (D.C. Cir. 1978); Liverwrighi v. United States, 347 F.2d 473, 475 (D.C. Cir. 1965); Shelton v. United States, 327 F.2d 601, 606-07 (D.C. Cir. 1963); Ex parte Frankfeld, 32 F.Sup. 915, 916 (D.D.C. 1940). The rules do not spell out any particular procedure for addressing claims of privilege or other objections, nor do they define the point at which contempt occurs. Once a contempt has occurred (whenever that is), enforcement by way of contempt proceedings requires a resolution voted on by the majority of the committee, which must then be acted on by the House itself and certified to the United States Attorney for prosecution. 2 U.S.C. §§192 and 194; Rules of the House, Rule XI 2.(m)(2)(B).[6] Thus, a majority of the committee is required to issue any subpoena, and a majority vote of the committee is required to enforce that subpoena. What role, if any, the committee plays in deciding whether the subpoena it has issued should or should not extend to items that are allegedly privileged is left unstated.
The Commonwealth argues that allowing the Chair alone to determine privilege issues (or any other issues affecting the scope of the subpoena) would have the very potential for abuse that the rules are intended to prevent and would be contrary to the requirement that only a majority of the committee can issue or enforce a subpoena. Where the committee can only compel testimony or document production by majority vote to issue the subpoena in the first place, and only the committee by majority vote can set in motion any enforcement proceedings, the Commonwealth contends that decisions about what the subpoena should or should not extend to must also be decided by a majority of the committee, not by the Chair alone.[7]
On the other hand, defendants argue that matters of procedure, such as rulings on any objections, are within the inherent power of the Chair and do not require committee vote or committee approval. Defendants further claim that, as a matter of practice, the Chair of any Congressional committee always handles objections and privilege claims and that such matters are never submitted to any committee vote.
The parties have submitted reports from other committee proceedings to illustrate how privilege claims have been handled in the past. Those historical examples do not demonstrate any uniformity in the methods for handling objections to Congressional subpoenas, and one very recent example actually illustrates that members of Congress themselves disagree on this precise point.[8] Many rulings on objections occur during the giving of testimony, where committee members are present and able to voice their views before the Chair issues a ruling. In such situations, while the ruling is certainly announced by the Chair, it is done so formally, in the presence of the committee, under circumstances where the committee could (if it chose) seek to influence or even overturn that ruling. Even in cases of document subpoenas (where there would not be a committee meeting convened to receive the documents), there is precedent for convening a committee meeting to decide privilege claims.[9]
Whatever the Chair’s ability to overrule objections to subpoenas, it is undisputed that only the committee itself can decide to report any failure to comply and thereby commence any form of contempt proceeding. Moreover, as these historical examples abundantly demonstrate, the committee debates on such contempt resolutions, and the resulting reports that are submitted to the House or Senate, contain extensive substantive discussion of the underlying merits of the asserted privileges.[10] Committee members are not bound by the Chair’s decision that a particular claim of privilege should not be recognized, and their disagreement with any such ruling by the Chair may form the basis for voting against any contempt resolution. Whatever the Chair’s views on overruling of any particular objection, the merits of the witness’ objections remain open to debate as successive bodies, not the Chair alone, decide whether to take any action to enforce the subpoena.[11] It is perhaps with this in mind that committee Chairs have, at least in some high-profile or controversial cases, made their rulings only after presentation to or consultation with other committee members.
*552 It is true, as defendants argue, that a witness has no specific right or procedural avenue to insist on a hearing or committee meeting on the subject of his privilege objections. Committee meetings may be convened only by the Chair or by written notice of a majority of the committee. House Rules, Rule XI, 2(c); Commerce Committee Rules, Rule 2(b)(1) and (2). In the event that a committee meeting is convened to consider the merits of a witness’ objections, the witness does not have a right to be present at that meeting. Thus, whether a letter from the Chair is or is not a valid “ruling” from the Chair, a witness receiving such a letter has no procedural avenue as of right by which to challenge either the validity or substance of that “ruling” until a contempt proceeding is commenced. The Chair may, whether his letter “ruling” is valid or not, convene a meeting to vote on a contempt resolution (and the witness still has no right to be present at that meeting). Once the Chair thinks he has issued a valid ruling, a witness who persists in refusing to comply is at least at risk of contempt. From that point on, if the Chair convenes a meeting to vote on a contempt resolution, and if the committee votes to report the “contempt” to the House (either because the committee endorses the substance of the Chair’s “ruling” or because the committee decides to affirm the Chair’s authority to rule on such matters), and if the House or Senate then votes to refer the matter to the U.S. Attorney for prosecution, and if the U.S. Attorney presents the matter to a grand jury and obtains an indictment, the witness will find himself in a criminal contempt proceeding before he has any “right" to be heard further on the merits of his objections.[12] Thus, for purposes of this analysis, the court will assume that Chairman Bliley’s letter of April 6 was a “ruling” that would, if defied, be sufficient to trigger contempt proceedings.
The court must then consider whether these defendants exhausted all possible avenues of redress prior to their receipt of Chairman Bliley’s April 6 “ruling." Where there are no specific procedural steps available to the witness as a matter of right until contempt proceedings are underway, there is no checklist of procedural steps by which the witness’ ostensible exhaustion of all possible avenues short of contempt may be measured. It is fair, however, for the court to require that the witness show that some serious effort was made to convince the Chair and/or the committee itself to recognize the privilege claims being asserted. It is not enough to show that there was a valid order from the Chair and/or the committee. There must be some showing that the defendants actually sought to convince the Chair and/or the committee to sustain their privilege objections.[13] A mere filing of some token assertion of privilege, if it is not actually pressed, does not preserve against waiver. See Westinghouse Electric Corp. v. Republic of the Phillippines, 951 F.2d 1414, 1427 n.14 (3d Cir. 1991) (filing a motion to quash based on claim of privilege does not preserve privilege when the motion was later withdrawn in exchange for a confidentiality agreement).
While there are no set procedures giving witnesses particular procedural rights with respect to challenging Congressional subpoenas, witnesses retain the full range of options available to any citizen to write, call or try to meet with members of Congress on matters of concern to them. In the examples provided to the court from other witnesses’ attorney-client privilege claims before Congressional committees, witnesses and their lawyers have displayed considerable energy and ingenuity in bringing their privilege claims to the attention of the committees involved.[14] The examples further show that Congressional committees, while they have the authority to disregard common law privileges, consider the merits of attorney-client privilege claims with great seriousness.[15]
In the present case, the defendants who were ostensibly opposing these subpoenas were particularly knowledgeable and well equipped to present their concerns to members of Congress. These defendants have decades of experience in dealing with Congress. They are represented by highly skilled attorneys with expertise in Congressional practice. They have equally skilled and experienced lobbyists. They are not neophytes in this arena. If, as defendants claim, they exhausted every reasonable avenue short of contempt to avoid having to produce these documents to the Commerce Committee, one would expect to see an impressive list of what they had done or tried to do in the seven weeks that elapsed between the issuance of the subpoenas and the allegedly compelled compliance with those subpoenas.[16]
The only evidence of defendants’ efforts to oppose this subpoena prior to Chairman Bliley’s letter “ruling” of April 6 is the one letter sent on behalf of all defendants on March 12.[17] That March 12 letter does assert that the subpoenaed documents are privileged, although it encloses no privilege log or other attempt to establish the factual basis of the claim of privilege. It does recite, at some length, alleged procedural deficiencies in the way the Minnesota court handled defendants’ privilege claims, but it does not address the substantive merits of the privilege claims. In particular, while arguing that the Minnesota court erroneously ordered production of documents that “related to” a crime or fraud and failed to assess whether a particular attorney-client communication was “in furtherance" of that crime or fraud, the letter does not even address the underlying allegation that there was a crime or fraud. The letter does not request some later opportunity to submit arguments on the merits of the privilege claims. It does not request any hearing or Committee meeting, or any opportunity to present these issues before the Committee as a whole or to some smaller group of Committee members. It does not ask the Chair to consult with other Committee members on this issue. The letter itself was not sent *553 to anyone other than Chairman Bliley — i.e., there is no evidence of any attempt to enlist the aid of other Committee members to try and convince the Chairman of the merits of their privilege claims. The only thing the March 12 letter actually asked Chairman Bliley to do was to delay making a ruling until appellate avenues in Minnesota had been exhausted. Indeed, the letter does not actually ask the Chairman to sustain the defendants’ objections or to withdraw the subpoenas. It only asks him to await the outcome of appellate proceedings in Minnesota before making a ruling and assures him that, if their objections are overruled and they are ordered to comply, they will do so.
Beyond that one letter, the defendants did have some oral communications with Chairman Bliley and/or his staff. However, the contents of those discussions are completely unknown and in any event totally unverifiable.[18] From the surrounding events and circumstances, and their timing, some general inferences can be drawn about some things that apparently were discussed with Chairman Bliley and/or his staff, but there is nothing to indicate let alone confirm that those discussions included efforts to convince the Chairman to sustain the objections to the subpoenas. Rather, the timing and the circumstances strongly suggest that what was discussed and pre-arranged with Chairman Bliley was that no action would be taken and no documents produced until the appellate process in Minnesota had been concluded but that the documents would be produced immediately if those appeals did not succeed in overturning the Minnesota trial court’s order. The April 6 letter from the Chairman and the defendants’April 6 cover letters accompanying defendants’ production also appear to have been pre-set, as that exchange of letters and the document production all took place within hours of the Supreme Court’s decision denying any further stay.[19] Thus, there is evidence that the defendants discussed timing and logistics with the Chairman and/or his staff, but no evidence that they made every reasonable effort to convince him or the Commerce Committee of the merits of their privilege claims.[20]
As with the earlier subpoena, there is also good ground to explain a willingness to produce these documents to Congress without any genuine protest. Defendants still wanted favorable legislation to implement the “national settlement,” they were at that time still committed to seeking its passage, and Chairman Bliley was trying to help them in that effort. Whether the Minnesota court’s rulings were legally correct or not, the determination by the Special Master and the trial Judge that there were thousands upon thousands of industry documents that related to or furthered criminal or fraudulent conduct on the part of the very companies that the proposed legislation would largely immunize from suit made it impossible to advance such legislation without first seeing these “crime-fraud” documents.
The only countervailing consideration was defendants’ desire to avoid public disclosure of the documents, many of which were sensitive and damaging. One would not lightly infer that any defendant was willing to turn over such materials. However, by way of the Minnesota proceedings, the documents would have to be placed in the hands of opposing counsel in any event. Although defendants were seeking an order from the Minnesota trial court that would prevent the Attorney General from making the documents public, defendants did not know whether that request would be granted and, even if successful in obtaining such an order, any documents introduced into evidence in the ongoing trial would certainly become available to the public. Once turned over to the Attorney General in Minnesota and his trial attorneys, Congress could of course subpoena those attorneys for the documents. As a practical matter, once the documents had to be turned over in Minnesota, Congress would be able to get them even if the general public could not. Arguing with Congress over the production of documents that Congress could soon obtain from another source would be both futile and counterproductive. Voluntary production of the documents to Congress, rather than engaging in major efforts to avoid production, had obvious political and public relations advantages. As on the prior ruling, the court infers not only that the defendants made no genuine effort to resist the subpoenas but that they had good reason to comply voluntarily, while making a single token objection to try and guard against waiver arguments in other forums.
Defendants argue that a ruling in favor of the Commonwealth on this issue involves impermissible “speculation” about defendants’ motives and “speculation” about defendants’ contacts with the Chairman and/or his staff. Defendants’ argument ignores the fact that it is they, and not the Commonwealth that bear the burden of proof on this motion. It is defendants who must prove that their production was not voluntary. They bear the burden of proving that their efforts to resist the subpoenas exhausted all steps reasonably available to them. When their discussions with the Chair about those subpoenas are conducted in private, with no notes, no witnesses, no record, etc. it is not “speculation” to decide that they have not met their burden of proof on that issue.[21] On this record, the only evidence of the defendants’ efforts to object to the Commerce Committee subpoena is the letter of March 12, 1998 in which they ask the Chair to postpone his ruling. That letter does not satisfy the court that defendants took all reasonably available steps and exhausted all reasonable avenues short of standing in contempt before they turned over the documents to the Commerce Committee.
*554 Defendants also argue that the court is improperly invalidating some Congressional action when it refuses to take the letters of March 12 and April 6 at face value, and that the court is improperly impugning the integrity of the Chair of the Commerce Committee. A ruling that these defendants have not met their burden of proving the absence of a waiver does not invalidate or overturn anything that Chairman Bliley and/or the Commerce Committee have done. The court’s analysis in fact assumes that the Chairman’s April 6 letter was a “ruling” from the Chair and that defendants would have been in contempt if they failed to obey it. This court’s conclusion that defendants made essentially no effort to convince Chairman Bliley not to render the substantive ruling announced in his letter of April 6 does not in any way impugn the Chairman’s integrity. The Chairman and the Commerce Committee wanted to see the documents in question for a valid legislative purpose, they issued a valid subpoena calling for their production, and, with the apparent acquiescence and perhaps even assistance of the defendants, issued a threatening letter “ruling” in order to obtain them. It is the lack of evidence about defendants’ own actions leading up to that “ruling" that causes them to lose this motion, not any act or omission on Chairman Bliley’s part.
Where defendants have not met their burden of proving that their prior disclosure of documents was involuntary, that prior disclosure must be deemed a waiver of whatever privileges may have applied to the documents.[22]
ORDER
For the foregoing reasons, the Commonwealth’s Motion to “De-Privilege” 39,000 Documents Produced by Certain Defendants to Congressman Bliley is ALLOWED.

 In context, it is also apparent that defendants had every reason to want to satisfy the Chairman’s request for documents. As a practical matter, legislation limiting the liability of these defendants in smoking and health litigation could not go forward without letting Congress see the defendants’ documents that had been found subject to the crime-fraud exception in the Minnesota proceedings. Disclosing the documents, and showing that the Special Master had misunderstood or misinterpreted them, was absolutely necessary before any such legislation could conceivably be passed. Moreover, time was of the essence. The Attorneys General lawsuits were going forward, the Minnesota trial was scheduled to start in January 1998, and delay in getting legislation through would hurt defendants’ interests. It is reasonable to infer that the “series of discussions” that defendants had with Chairman Bliley’s “staff’ during the month between the Chairman’s letter request and the subpoena included discussion about the strategic necessity of getting the documents to the Committee without further delay (and perhaps discussion of the importance of avoiding any appearance that the tobacco industry was trying to “hide” the documents from Congress). Thus, the court opined that defendant’s production of the documents was not only not compelled but was probably a “deliberate, strategic decision.”

 The subpoena to B&W also called for documents that had been ordered produced in earlier Minnesota decisions. Those orders had been entered as a sanction against B&W for discovery abuses. They did not contain any rulings on the issue of privilege.

 Trial of the Minnesota action was already well underway at the time of the judge’s decision.

 The Minnesota orders had required defendants to produce the documents with these kinds of aids, and the court infers that the production to the Commerce Committee included voluntarily those additional items that had already been prepared for the Minnesota proceedings.

 The Committee could not have completed its own substantive review of the 37,000 documents to cull out these 400 items in just two weeks. From the timing of these events, the court infers that defendants had communicated to Chairman Bliley which of these roughly 37,000 documents they viewed as particularly sensitive. Through inadvertence, the documents were originally placed on the Internet in a fashion that made these 400 particularly sensitive documents accessible to persons who already knew the Bates numbers used in the Minnesota action. The Committee had not intended to disclose those documents without further review, and took steps to prevent Internet access to them once the error was discovered.

 The House does not have any procedure for pursuing a civil remedy, so criminal prosecution under §192 is its only avenue for enforcement. The Senate does have the option of civil enforcement. 28 U.S.C. §1365.

 The Commonwealth also points to cases referring to the need for a “committee” ruling on objections before a witness’ refusal to answer is intentional and thus contemptuous. Quinn v. United States, 349 U.S. 155, 165-66 (195 5); Empsak v. United States, 349 U.S. 190, 202 (1955). However, Üiose cases do not suggest that a Chairman’s ruling on behalf of a committee is an inadequate ruling. The cases stand only for the proposition that there must be a “ruling” before there can be any willful contempt. They do not address how such rulings are to be made or who has authority to make them. The Commonwealth also points to Ansara v. Eastland, 442 F.2d 751, 753-54 (D.C. Cir. 1971), in which the court observed that plaintiffs’ objections to the subpoenas they were challenging would be heard and resolved by the “Committee.” Again, Ansara was not addressing the issue of the Chairman’s right to act on behalf of a committee. Moreover, the court’s observations about the “committee” considering the witness’ objections could have referred to the committee’s consideration of any contempt resolution. These stray references to the “committee” hearing or deciding on objections to subpoenas do not preclude the Chairman from acting on behalf of the “committee."

 In 1996, the House Committee on Government Reform and Oversight issued subpoenas seeking production of documents in connection with its investigation of the firing of White House Travel Office employees. In response to those subpoenas, various privileges were asserted, including a claim of attorney-client privilege. In correspondence and discussions, the Chair made clear his view that the documents were to be produced, notwithstanding the asserted privileges, and demanded that the documents be produced by a certain date or else contempt proceedings would be initiated. A resolution reporting the contempt to the full House was passed by a 27 to 19 vote. Among the concerns raised by the dissenters was the fact that the Committee itself had not overruled the objections and instructed the witnesses to comply prior to voting on the contempt resolution, and that the Committee had not given the witnesses an opportunity to present their privilege claims to the Committee as a whole. Proceedings Against John M. Quinn, David Watkins and Matthew Moore, House Rpt. No. 104-598, 104th Cong. 2d Sess. (1996), pp. 88-89, 95-98, 103-04. Thus, there was disagreement within the Committee itself as to whether the unilateral decision by the Chair, standing alone, was suffi *555 cient to overrule the privilege claims and trigger any contempt.

 During the Senate investigation of the Whitewater matter, a subpoena was issued to the former Associate Counsel to the President seeking production of certain meeting notes. The witness asserted attorney-client and work product privileges with respect to the notes. The Chair then “convened a meeting of the Committee to rule on the objections.” Refusal of William H. Kennedy, III, to Produce Notes Subpoenaed by the Special Committee to Investigate Whitewater Development Corporation, Sen. Rpt. No. 104-191, 104th Cong., 1st Sess. (1995), p. 7. Arguments were presented, the advice of Committee counsel was obtained, and the Chair then overruled the objections. Id. However, after, this ruling from the Chair, “[t]he Committee then voted to order and direct Mr. Kennedy to produce the subpoenaed documents by 9:00 a.m. on December 15, 1995." Id. The resolution to report the contempt to the full Senate occurred only after the witness failed to comply with the order and deadline set by the Committee’s vote. Thus, although the “ruling” was from the Chair, it was made formally in the course of the Committee meeting, and it was followed by a Committee vote ordering compliance by a certain date.

 Indeed, debate on the substantive merits of the asserted privileges continues through the House and Senate debate on whether to send the matter to the U.S. Attorney.

 By contrast, when a court has ordered someone to comply with a subpoena, that court has already heard and decided the merits of any privilege claims. Any refusal to comply with that order may result in an immediate contempt proceeding in front of the same court (and often the same judge) that issued the order. The merits of the underlying objections are not normally reheard prior to the contempt proceeding itself.

 A witness’ subsequent compliance with the subpoena would not necessarily prevent the contempt prosecution from going forward. The prosecution is ostensibly to punish the prior contempt, and later compliance does not erase the prior offense. See United States v. Costello, 198 F.2d 200, 205-06 (2d Cir. 1952); United States v. Brewster, 154 F. Supp, 126, 135-37 (1957). As a practical matter, however, contempt resolutions and prosecutions are pursued to obtain compliance and are customarily dropped once the witness (belatedly) complies. Defendants’ own authorities report many examples of contempt resolutions not being sent on to the House or Senate, or being recalled, or even being recalled from the U.S. Attorney’s Office after the witness has complied. Jay R. Shampansky, Congress’ Contempt Power, Congressional Research Service ReportNo. 86-83A (1986), pp. 14-15, 52-54. Defendants have not cited to a single instance within the last forty years of anyone being prosecuted for contempt after ultimately complying with a Congressional subpoena. In light of this history, there is effectively no risk to a witness in at least awaiting the outcome of the committee’s meeting and vote on the contempt resolution (i.e., in finding out whether the committee will in fact agree with the Chair’s “ruling”) before complying with the subpoena. Defendants’ suggestion that their chief executive officers feared “going to jail” if they did not comply immediately following Chairman Bliley’s April 6 letter is the grossest exaggeration. However, consistent with established jurisprudence on the subject of waiver, a witness is not required to be in contempt in order to avoid waiver, even if (as here) any consequences of that contempt can clearly be avoided by later compliance.

 This requirement is equally applicable to court proceedings on subpoenas. For example, if a witness faced with a subpoena and a motion to compel advised the court that he did not oppose the motion, or that he merely wanted an order in place for his protection before complying with the subpoena, that witness would be deemed to have waived the privilege. The “validity” of the order would not suffice to avoid waiver if the witness had not in fact opposed the issuance of the order.

 See, e.g., Proceedings against Ralph Bernstein and Joseph Bernstein, House Rpt. No. 99-462, 99th Cong., 2d Sess. (1986). The Bernstein matter arose out of the investigation of Ferdinand and Imelda Marcos’ real estate holdings. Two witnesses asserted attorney-client privilege in the course of their testimony before the Subcommittee on Asian and Pacific Affairs, and their contempt was ultimately sent to the full House by resolution of the Committee on Foreign Affairs. Prior to that contempt, the Bernsteins’ counsel met with the Chairman and the ranking minority member to outline the basis of their privilege claims. Their lawyer then met further with individual Subcommittee members. Further arguments on privilege were submitted in writing not only to the Chair but also to the other Subcommittee members. At the next Subcommittee meeting, the witnesses asked for and were given an opportunity to present lengthy arguments concerning the asserted privileges before the Subcommittee. The objections were ultimately overruled by the Chair during the course of that Subcommittee meeting. The witnesses asked for and were given another day in which to consider their position, and were again allowed to argue the merits of their privilege claims before the Subcommittee as a whole voted on the contempt resolution.

 Defendants contend that the House has a “long-settled practice" of not recognizing the attorney-client privilege (Affidavit of Michael J. Barrett, Jr., ¶6), but authorities submitted by defendants make clear that attorney-client privilege claims are in fact heard on their merits and “often observed.” Jay R. Shampansky, Congress' Contempt Power, Congressional Research Service Report No. 86-83A (1986), pp. 29-30. Moreover, when any contempts are reported to the full House, the committee reports on those resolutions contain extensive discussion of the merits of the attorney-client and work product privileges claimed. See, e.g., Proceedings against John M. Quinn, David Watkins and Matthew Moore, House Rpt. No. 104-598, 104th Cong.2d Sess. (1996), pp. 46-54; Proceedings against Ralph Bernstein and Joseph Bernstein, House Rpt. No. 99-462, 99th Cong., 2d Sess., 132 Cong. Rec. 3031-33, 3037-38, 3045-47 (February 27, 1986). While these reports observe that Congress is not required to recognize such common law privileges, the committees in question examined the merits of the privilege claims and only proceeded against the witnesses when the committee was satisfied that the privilege was not property asserted. In the present case, if the Chairman and/or the Commerce Committee were not going to recognize even a meritorious attorney-client privilege claim, there would have been no reason for the Chairman to await the outcome of the appeals from the Minnesota trial court orders before “ruling” on defendants’ privilege claims.

 defendants’ attorneys are also extremely skilled and vigilant in the protection of their clients’ privileges and are well-versed in the law of waiver. Particularly where this court had already overruled privilege claims based on waiver arising out of defendants’ overly informal way of handling the earlier Commerce Committee subpoena, one would expect a heightened awareness of the need to demonstrate that all avenues short of contempt had in fact been pursued and exhausted.

 By definition, letters sent to the Chairman after his “ruling” on the objections are not part of any advance effort to persuade him to “rule” in defendants’ favor. Defendants’ cover letters accompanying their production were written for courts that would later be hearing arguments about waiver. They were not designed to convince Chairman Bliley to alter his “ruling.”

 The court inquired whether there were any notes reflecting telephone calls or meetings with the Chairman or his staff, as those might help confirm at least the topics that were discussed. Defendants advised that there were no notes *556 pertaining to any of the discussions with Chairman Bliley or his staff.

 Defendants acknowledge that one of the items conveyed to Chairman Bliley was this court’s prior decision refusing to treat defendants’ unspecified oral communications with the Chairman’s “office” as a “ruling of the chair.” In other words, the one thing that is known to have been discussed is defendants’ desire to avoid any appearance of waiver. The pre-arranged April 6 letters were clearly designed to address that concern.

 Defendant CTR claimed in a later submission to the Minnesota court that the entirety of its discussions with the Chairman’s staff included three telephone calls in late February and early March to staff counsel “in an effort to facilitate CTR’s response to the Subpoena. ” The specific topics allegedly discussed were “the format in which the documents would be produced” and clarification as to whether the subpoena to CTR was intended to cover certain documents of another entity, to which staff counsel replied that production on CD-ROM in PDF format would be acceptable and that the other entity’s documents did not need to be produced. CTR also stated that there was another phone call on April 6 to discuss “the timing of CTR’s response.” Discussions about ”facilitat[ing]” CTR’s response, confirming the “format” and “timing” of that response, would not suggest any substantive discussion whatsoever about the merits of CTR’s privilege objections.

 There is nothing wrong or improper about having communications with a Congressman in private. However, where one bears the burden of proof on some issue to which those communications are relevant, it becomes difficult to sustain that burden of proof. When discussions about response to the subpoenas consisted entirely of closed door negotiations with Chairman Bliley and/or his staff, it is impossible to determine whether defendants in fact asserted their privilege claims or waived them during those discussions. By comparison, court hearings on privilege objections take place on the record and normally in the presence of the other parties, and there is usually no difficulty in determining whether the privilege claim has in fact been genuinely asserted before a court.

 The court’s ruling on the issue of waiver obviously does not address any objection to admissibility other than an objection based on privilege. Nothing in this ruling forecloses defendants from raising other pertinent objections with respect to any particular document that the Commonwealth seeks to introduce at trial.